**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| R2X, LLC d/b/a READY-2-XECUTE., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 1:23-cv-01568 |
| | ) | |
| v. | ) | |
| | ) | |
| AUSTIN WINDSOR. | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, R2X, LLC d/b/a Ready-2-Xecute ("R2X" or "Plaintiff"), by counsel, for its Complaint against Defendant, Austin Windsor ("Windsor" or "Defendant"), alleges as follows:

### NATURE OF THE ACTION

1.     R2X brings this action seeking preliminary and permanent injunctive relief preventing Windsor from breaching the post-employment restrictions—including non-solicitation of R2X current and prospective customers and non-disclosure of trade secrets and confidential information—contained in the Employment Agreement (the "Agreement") into which he entered with R2X.  In addition, R2X seeks monetary damages to the extent calculable as a remedy for the harm Windsor has caused to R2X.

2.     During his employment with R2X, Windsor gained access to R2X's entire playbook and was privy to R2X's trade secrets and confidential information about its business strategy, customers, and other aspects of the company's business. He is legally obligated not to misappropriate that information.

3.      Under the Agreement, Windsor expressly promised to not use or disclose R2X's trade secrets and confidential information except as required in connection with his employment at R2X. In addition, Windsor agreed, *inter alia*, that for a period of 24 months after cessation of his employment with R2X, he would not solicit R2X customers, for the purpose of offering goods and services competitive to those offered by R2X, which customers he serviced or solicited during his last 12 months of employment.

4.      Since his departure from R2X, Windsor has been using R2X's playbook to compete unfairly and divert business to a competitor. By (i) soliciting R2X customers, and (ii) using or disclosing R2X's confidential information for his own benefit and the benefit of a competitor, Windsor has engaged and is continuing to engage in conduct directly contrary to the post-employment obligations he agreed to honor. This activity breaches his non-solicitation and confidentiality obligations owed to R2X under the Agreement and constitutes trade secret misappropriation under federal and state law.

5.      R2X brings this action seeking preliminary and permanent injunctive relief to enforce Windsor's contractual obligations and cease his misappropriation of R2X's trade secrets as well as to recover damages incurred as a result of Windsor's conduct.

## PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff R2X, LLC is an Indiana limited liability company having its principal office address at 10475 Crosspoint Blvd., Suite 250, Indianapolis, IN 46256.

7.      Austin Windsor is an individual believed to reside at either 11405 Indian Creek Rd., Indianapolis, IN, 46236 or 13298 Hockley Dr., Fishers, IN 46037.

8.      This Court has subject matter jurisdiction over the claims of R2X pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because R2X alleges a claim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 et seq., and R2X's other

claims are so related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1-2) because a substantial part of the events giving rise to R2X's claims occurred in this District and because Windsor is believed to reside in Marion County.

10.     In addition, jurisdiction and venue are proper under the choice of law and forum selection provisions of Agreement. Agreement ¶ 15.

## BACKGROUND FACTS

### R2X's Business and Operations

11.     R2X is a third-party logistics company and licensed freight brokerage. It coordinates the transportation of freight between its customers and carriers to effectively and efficiently transport goods. R2X's customers include both companies that need to ship goods from one location to another and other freight and logistics companies needing assistance in finding a carrier to satisfy their shipping demands.

12.     R2X is what is known as a non-asset-based logistics company. Generally, it does not own the means of transportation (such as trucks, trailers, etc.) and does not employ drivers. Rather, it serves as a broker between clients who need transportation of their goods and independent carriers that are able and willing to haul freight at the times and places required by R2X's customers.

13.     R2X maintains a freight broker license with the U.S. Department of Transportation's Federal Motor Carrier Safety Administration under Docket Number MC 561408. Its DOT number is 2236433.

14.     R2X's business involves the collection, generation, use, and protection of proprietary, trade secrets, confidential and competitively-sensitive information and materials

concerning the operations, processes, technologies, logistics, experience, and structure of providing third-party logistics services to many industries. R2X has heavily invested in its trade secrets and confidential information, which include, but are not limited to, its: (i) relationships with its customers, (ii) detailed customer information, (iii) network of effective and reliable carriers, (iv) industry-specific know-how, and (v) highly trained employees.

15.     With regard to customer information, R2X has compiled a proprietary database of information including: the identity of customers; the customer contacts responsible for the shipment of certain freight; the industry segments in which they operate; the particular shipping lanes where the customers require freight transportation; the required equipment to move the freight; contract terms; the customer's shipping and freight history; pricing, financial parameters, and time constraints for a customer's freight; and detailed knowledge of a customer's operations and procedures.   Compiling, gathering, and obtaining this information represents a material investment of R2X's time and money. The information is a trade secret owned by R2X, highly confidential to R2X, and constitutes a valuable, proprietary asset.

16.     R2X maintains its customer information in strict confidentiality internally and externally to prevent disclosure, misuse, and misappropriation. R2X has taken reasonable steps to protect the secrecy of its trade secrets and confidential information, including, but not limited to, restricting access to R2X's password-protected computer network, restricting internal access to such information to a limited pool of employees who have a "need to know" the information to perform their duties, and requiring employees to agree to employment agreements with restrictive covenants, including non-disclosure of trade secrets and confidential information.

17.     R2X spends a great deal of time, money, and other resources developing relationships with new customers and strengthening relationships with existing ones. R2X's

relationships with its customers typically last for a significant period of time and are the result of substantial effort, time, resources, and goodwill. Much of R2X's success derives from its ongoing and longstanding relationships with and retention of both customers and employees. R2X invests tremendous time and effort into developing and maintaining these relationships, and R2X relies on repeat business and workforce stability as part of its business model. R2X maintains extraordinary goodwill with its customers and employees, allowing the company to be successful in a highly competitive industry.

18.     R2X invests significant resources into creating, developing, and managing its workforce and crews, including substantial training and compensation. R2X employees are privy to R2X trade secrets and confidential information which would be extremely valuable to competitors. R2X's trade secrets and confidential information are neither generally known outside of R2X nor readily ascertainable by others.

19.     The third-party logistics industry (and the freight-shipping industry at large) is extremely competitive. Relationships with customers, carriers, and other brokers are critical to success. It is very common in the brokerage industry for companies to have non-compete, non-solicitation, and confidentiality agreements with their employees and contractors.

20.     To protect its trade secrets, customer relationships, and other confidential information, R2X requires its employees to agree to certain restrictive covenants that restrict their ability to compete with R2X, to solicit R2X's customers or employees, or to disclose or misuse R2X's confidential and proprietary information and trade secrets.

<u>Windsor's Employment and Restrictive Covenants</u>

21.     Windsor began his employment with R2X in June 2022. He held various roles during his time with R2X, including Dispatcher, Account Manager, Dedicated Carrier Operations,

and Account Representative. Windsor's roles at R2X have always been customer-facing and have always included servicing the needs of one of R2X's largest customers, referred to herein as "Customer BT." His duties included, *inter alia*, proactively reaching out to customers and prospective customers about freight opportunities, providing quotes to customers and prospective customers, being aware of and striving to achieve or exceed customers' key performance indicators, making final pricing decisions, setting pricing targets, contacting customer transportation managers daily, building relationships with customers, rating shipping lanes, and gathering confidential customer information for the benefit of R2X.

22.    From June 2022 through October 2022, Windsor moved 1,031 loads for Customer BT, generating $1,646,358.99 in revenue for R2X.

23.    From October 2022 through January 2023, Windsor moved 195 loads for other R2X customers generating $126,774.01 in revenue for R2X.

24.    From January 2023 through June 2023, Windsor moved 1,429 loads for Customer BT, generating $1,927,225.57 in revenue for R2X.

25.    Windsor also attended company dinners with the transportation manager for Customer BT.

26.    In his position with R2X, Windsor had access to and knowledge of R2X's trade secrets and confidential information, including, but not limited to, the following: the identity of customers; customer representative contact information; customers' particular shipping lanes; customers' shipping and freight history; unique customer pricing and financial parameters; and customers' operations and procedures for working with freight companies. Windsor also had access to R2X's current and future strategy and plans, developed close relationships with

customers, was provided special training, developed special skills and expertise, and was imparted with "know-how" relating to company and industry practices.

27.     In light of Windsor's access to R2X's trade secrets and confidential information, his close contact with its customers, the relationships he developed with customers and fellow employees, and the substantial resources R2X invested in Windsor for the success of the company, R2X protected its legitimate business interests by requiring Windsor to agree to certain restrictions on his activates during and after his employment, including restrictions on competition, customer and employee solicitation, and use or disclosure of trade secrets and confidential information.

28.     R2X would not have given Windsor access to its trade secrets and confidential information but for his consent to the Agreement and the restrictive covenants and obligations contained therein.

29.     As a condition of employment and for other good and valuable consideration, on or about March 13, 2023, Windsor entered into the Agreement with R2X, attached as **Exhibit A**.

30.     Paragraph 7 of the Agreement states, in relevant part, as follows:

7.     <u>Confidential Information</u>. Employee understands and acknowledges that during the course of employment by Company, Employee will have access to and learn about Confidential Information, as defined below.

        (a)     <u>Confidential Information Defined</u>. For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic, or any other form or medium, relating directly or indirectly to: business practices, plans, publications, documents, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, proprietary computer software, records, supplier information, vendor information, financial information, accounting information and records, legal information, marketing information, advertising information, pricing information, personnel information, employee lists, supplier lists, vendor lists, reports, sales information, revenue, costs, ideas, customer information and customer lists of Company or its businesses or affiliates, or any existing or prospective customer, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to Company in confidence.

Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified or treated as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Employee understands and agrees that Confidential Information includes information developed by Employee in the course of Employee's employment by Company as if Company furnished the same Confidential Information to Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to Employee, provided that the disclosure is through no direct or indirect fault of Employee or person(s) acting on Employee's behalf.

(b)     Company Creation and Use of Confidential Information. Employee understands and acknowledges that Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its logistical and freight brokerage services for commercial customers. Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

(c)     Disclosure and Use Restrictions. Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of Company) not having a need to know and authority to know and use the Confidential Information in connection with the business of Company and, in any event, not to anyone outside of the direct employ of Company except as required in the performance of Employee's authorized employment duties to Company or with the prior consent of Company's CEO in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of Company, except as required in the performance of Employee's authorized employment duties to Company or with the prior consent of Company's CEO in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

Employee understands and acknowledges that Employee's obligations under this Agreement regarding any particular Confidential Information begins immediately when Employee first has access to the Confidential Information (whether before or after beginning employment with Company) and shall continue during and after Employee's employment by Company until the time that the Confidential Information has become public knowledge other than as a result of Employee's breach of this Agreement or breach by those acting in concert with Employee or on Employee's behalf.

8

31.     Paragraph 9 of the Agreement states, in relevant part:

9.     Restrictive Covenants.

(a)     Acknowledgment. Employee understands that the nature of Employee's position gives Employee access to and knowledge of Confidential Information and places Employee in a position of trust and confidence with Company. Employee acknowledges that Company provides logistical and freight brokerage services to commercial customers across the continental United States, Canada and Mexico, and that Company's business and Employee's service on behalf of Company are not limited to any specific geographic territory within the continental United States, Canada and Mexico. Employee further understands and acknowledges that Company's ability to reserve Confidential Information for the exclusive knowledge and use of Company is of great competitive importance and commercial value to Company, and that improper use or disclosure by Employee is likely to result in unfair or unlawful competitive activity. If Employee is engaged in a sales position, Employee further understands and acknowledges that Employee's primary responsibilities include developing new business for Company by promoting and soliciting the sale of Company's services to prospective and existing customers, and initiating and attending sales calls and meetings with prospective and existing customers, resulting in Employee developing and maintaining critical relationships necessary for the success and growth of Company's business.

* * *

(d)     Non-Solicitation of Customers. Employee understands and acknowledges that because of Employee's experience with and relationship to Company, Employee will have access to and will learn about much or all of Company's customer information, including, but not limited to, customer contact names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's sales.

Employee understands and acknowledges that: (i) Company's relationships with its customers is of great competitive value; (ii) Company has invested and continues to invest substantial resources in developing and preserving its customer relationships and goodwill; (iii) Employee's responsibilities include providing services to and/or for the benefit of Company's customers for the duration of the customer's relationship with Employer, and (iv) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to Company.

Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this Agreement, or meet with Company's current or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by Company. However, it will not be deemed a violation of this Agreement if Employee merely updates Employee's LinkedIn profile, or connects with a covered customer or former customer on Facebook or LinkedIn, without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This restriction shall only apply to: (i) customers Employee serviced or solicited during the last 12 months of Employee's employment with Company, and (ii) prospective customers to whom Company has made a written or verbal proposal or solicitation for which Employee was directly involved or had supervisory responsibility during the 12 months preceding the end of Employee's employment with Company.

32.     Paragraph 11 of the Agreement states, in relevant part:

11.     Acknowledgment. Employee acknowledges and agrees that: (i) Employee's services to be rendered to Company are of a special and unique character; (ii) that Employee will obtain knowledge and skill relevant to Company's industry, methods of doing business, and marketing strategies by virtue of Employee's employment; (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of Company; and (iv) that Employee will be reasonably able to earn a living without violating the terms of this Agreement; and (v) that Employee has the right to consult with counsel before signing this Agreement.

Employee further acknowledges that: (i) the amount of Employee's compensation reflects, in part, Employee's obligations and Company's rights under this Agreement; (ii) Employee has no expectation of any additional compensation, bonus, or other payment of any kind not otherwise referenced herein in connection herewith; and (iii) Employee will not be subject to undue hardship by reason of Employee's full compliance with the terms and conditions of this Agreement or Company's enforcement thereof; and (iv) this Agreement is not a contract of employment and shall not be construed as a commitment by either Party to continue an employment relationship for any certain period of time.

33.     Paragraph 12 of the Agreement states, in relevant part:

12.     Remedies. In the event of a breach or threatened breach by Employee of any of the provisions of this Agreement, Employee hereby consents and agrees that money damages would not afford an adequate remedy and that Company shall be entitled to seek a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available relief.

34.     With regard to R2X's trade secrets and confidential information, including customer relationships, Windsor acknowledged (i) his access to the information, (ii) R2X's substantial investment in developing and protecting the information, (iii) the competitive advantage of the information, (iv) R2X's legitimate business interests in the information, and (v) that misuse of the information will irreparably harm R2X.

35.     Except as required in connection with fulfilling his previously authorized employment duties, Windsor expressly promised to not use or disclose R2X's trade secrets and confidential information. In addition, Windsor agreed that for a period of 24 months after cessation of his employment with R2X, he would not solicit R2X customers, for the purpose of offering goods and services competitive to those offered by R2X, whom he serviced or solicited during his

last 12 months of employment. Windsor also agreed to not solicit certain prospective customers of R2X.

36.     Windsor acknowledged that the restrictive covenants (i) are necessary to protect R2X's legitimate business interests, (ii) are reasonable, and (iii) would not prevent him from earning a living and compliance with such would not subject him to undue hardship.

37.     The agreement also permits the court to modify, sever, strike, or delete portions of the Agreement such that the intent of the parties is carried out to the maximum extent permitted by law. Agreement ¶ 18.

38.     In addition, Paragraph 22 of the Agreement allows R2X to collect attorneys' fees incurred by R2X to enforce the Agreement against Windsor, as follows:

> 22.     Attorneys' Fees. If Employee breaches any of the terms of the restrictive covenant obligations in this Agreement, to the extent authorized by state law, Employee will be responsible for payment of all reasonable attorneys' fees and costs Company incurred in the course of enforcing the terms of the Agreement, including demonstrating the existence of a breach and any other contract enforcement efforts.

<u>Defendant's Unlawful Conduct</u>

39.     On information and belief, XTC Transportation Service, Inc. is a Canadian corporation ("XTC Canada") with its principal office address at 31 Beacon Point Court, Breslau, Ontario. XTC Canada is a third-party logistics company. Prior to October 2022, XTC Canada did not have the staff and resources to secure carriers in the United States. XTC Canada thus contracted with, and became a customer of R2X.

40.     In October 2022, XTC US Xpress Inc. ("XTC US") was formed. It is also a third party logistics company and an Indiana corporation with its principal address at 101 W Ohio St., Suite 575, Indianapolis, IN, 46204. XTC Canada and XTC US are collectively referred to as "XTC." XTC US is also a third-party logistics company. It maintains a freight broker license with

the U.S. Department of Transportation's Federal Motor Carrier Safety Administration under Docket Number MC 1012671. Its DOT number is 3230333. XTC is a competitor to R2X.

41.    In early to mid-2023, several R2X employees resigned their employment with R2X. On information and belief, by July, 2023, at least seven former R2X employees joined XTC US.[1]

42.    Windsor resigned from his employment at R2X on June 30, 2023 and began employment at XTC US shortly thereafter.

43.    To protect its trade secrets and confidential information and to enforce the former employees' restrictive covenants, on or about May 9 and June 19, 2023, R2X, through counsel, sent cease and desist letters to several of the former employees employed by XTC US and cc'd XTC US's President, Brad Barges.

44.    On May 18, 2023, XTC US responded, through counsel, to R2X's May 9, 2023 cease and desist letters and denied any wrongdoing by it or its employees. XTC US's May 18, 2023 response is attached as **Exhibit B**.

45.    On July 12, 2023, Windsor directly solicited Customer BT, whom he worked with while at R2X. By email to a representative of Customer BT, Windsor stated:

> Good afternoon, ▮ –
>
> My name is Austin Windsor and *we have worked together in the past*. I enjoyed our relationship and wanted to *bring my new company to your attention*. I think we would be a great fit for your organization.
>
> I represent XTC U.S. Xpress. I am based in Indianapolis…….we have another U.S. office in Chicago…….our Canadian sister company XTC Logistics has 2 Canadian locations. One is in Amherstburg, Ontario. . . .

(Confidential information and trade secrets redacted and emphasis added.)

---

[1] George Lowe, Riley Germin, Matthew Intriago, Sean Compton, Andrew Karlendar, Kayla Compton, and Austin Windsor are the seven former R2X employees believed to now be working at XTC US. Laurie Collins, an independent contractor, also resigned her position and, on information and belief, began employment with XTC US. R2X is informed and believes that R2X former employee Patrick Sturm was also hired by XTC, but Mr. Sturm's employment at XTC ended on or about May 12, 2023.

46.     After providing detailed information on XTC's capabilities, Windsor continued:

> ***Myself and our team, including Laurie Collins who is added here***, have also been working with ███████ and the team in Pennsylvania to get set up there, but they are currently in a holding pattern with current carriers. We have also spoken with the team in Anderson as we are based in Indy, and this is how we ended up reaching out to you.
>
> ***I know [Customer BT] has already awarded their lanes this year but am offering you better rates than your current providers and a team of guys that have worked with [Customer BT] directly in previous years.***
>
> I know you need to be loyal to your current carriers, but busy season is here, and we are looking to get involved on a few lanes to show you what we have to offer after working extremely hard to get to this point.
>
> We have our own ***equipment that I know would assist your Mid Atlantic team and Midwest*** now that things are starting to ramp up for Summer.
>
> How can we get involved on some of your more difficult lanes?  We don't mind helping as a backup either.
>
> ***We have 7 guys working together, directly on our*** ███████ ***business @ our Indianapolis office that know exactly how [Customer BT] operates, know your procedures, and know your lanes.*** We also have several folks from another carrier partner of [Customer BT] that are wanting to join our team, and we feel that would be a great fit over here if we were to come on board. I am certain we would be an asset to you and your team.
>
> I know we are headed into a long weekend, and I wanted to get this in front of you before that. If you have time to jump on a quick call either today, or anytime next week, do not hesitate to reach out.  I am available pretty much anytime, as is our management team and owner, Brad Barges.
>
> If you would get back to me when you get a moment, we would appreciate it.  ***See attached business proposal for [Customer BT]***.

(Confidential information and trade secrets redacted and emphasis added). A redacted copy of Windsor's email communication to Customer BT is attached as **Exhibit C**.

47.     This communication demonstrates that Windsor knows and is taking advantage of R2X's playbook, in breach of his non-solicitation and confidentiality obligations. Not only is he clearly soliciting R2X's customer, but he is also indisputably relying upon R2X's trade secrets and

confidential information. The following chart demonstrates the trade secrets and confidential information Windsor is relying upon:

| Windsor's Statement | R2X Trade Secret and Confidential Information Relied Upon |
|---|---|
| ". . . we have worked together in the past . . ." | • Relationship with Customer BT<br>• Customer BT's shipping and freight history |
| "I know [Customer BT] has already awarded their lanes this year . . ." | • Contract terms with Customer BT |
| ". . . but [I] am offering you better rates than your current providers . . ." | • Pricing with Customer BT<br>• Customer BT's financial parameters |
| "We have our own equipment that I know would assist your Mid Atlantic team and Midwest . . ." | • The equipment required to move freight for Customer BT<br>• Customer BT's freight and shipping operations and preferences<br>• Customer BT's specific shipping lanes |
| "We . . . know exactly how [Customer BT] operates . . ." | • Customer BT's freight and shipping operations and preferences |
| We . . . know [Customer BT's] procedures . . ." | • Customer BT's procedures for working with third-party logistics companies. |
| We . . . know [Customer BT's] lanes . . ." | • Customer BT's specific shipping lanes<br>• R2X's relationship with Customer BT<br>• Customer BT's shipping and freight history |
| Use of Customer BT representative's name and email address | • Identity of Customer BT<br>• Customer BT representative's contact information |

48.    In addition, R2X does not have a copy of the "business proposal" attached to Windsor's July 12, 2023, solicitation to Customer BT. The business proposal likely also relies upon R2X's trade secrets and confidential information.

49.    Armed with R2X's entire game plan, and apparently unafraid to solicit R2X's customers, Windsor is knowingly attempting to undercut R2X's pricing, offer competitive services, and divert business to XTC.

50.     Windsor's repeated statements about having "a team of guys" that know Customer BT's operations, procedures, shipping lanes, and other needs indicates that he may not be alone in relying upon R2Xs trade secrets and confidential information.

51.     In a further attempt to protect its trade secrets and confidential information, On July 14, 2023, R2X responded to XTC's May 18, 2023 letter. R2X's July 14, 2023, response to XTC is attached as **Exhibit D**. XTC US responded, through counsel, on July 20, 2023 again denying any wrongdoing by it or its employees. XTC US's July 20, 2023 letter is attached as **Exhibit E**.

52.     R2X also sent a cease and desist letter to Windsor on July 14, 2023. The letter was returned undeliverable so R2X send a second, nearly identical letter to Windsor at XTC's office address on August 10, 2023. R2X's July 14 and August 10, 2023, cease and desist letters to Windsor are attached as **Exhibit F**. Windsor never responded at all and R2X is left without any assurance that Windsor will comply with his restrictive covenants. On information and belief, Windsor, is continuing to solicit R2X's customers in breach of his restrictive covenants.

53.     Despite R2X's best efforts, attempted resolutions have not been successful. To date, Windsor has never responded to any of R2X's letters.

54.     Windsor has misappropriated R2X's trade secrets and confidential information. Windsor's actions (i) directly violate, or threaten to imminently violate, the post-employment restrictions contained in the Agreement, (ii) threaten the goodwill and long-standing valuable customer relationships R2X has fostered and developed over the past several years, and (iii) raise concerns over loss of valuable, competitive trade secrets and confidential information. The damage to R2X if Windsor is permitted to unfairly compete, solicit and service R2X's customers and use or disclose R2X's trade secrets and confidential information threatens immeasurable and

irreparable harm to R2X. Accordingly, R2X lacks an adequate remedy at law, and the harm it has suffered and will continue to suffer cannot be remedied purely by money damages.

55.     Windsor's actions are intentional, willful, and malicious and/or in bad faith.

56.     To the extent required, R2X pleads its claims in the alternative.

### COUNT I – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT

57.     R2X realleges and incorporates by reference the allegations set forth in foregoing paragraphs as if fully set forth herein.

58.     R2X's trade secrets and confidential information described above constitute trade secrets as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1832 et seq. ("DTSA"). This information has independent economic value because it is not generally known to and not readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

59.     The value of R2X's trade secrets is demonstrated, in part, by Windsor's use of those trade secrets after separation from R2X to solicit Customer BT.

60.     R2X's trade secrets are not generally available to its competitors. It derives independent economic value from not being generally known to other persons who could otherwise obtain economic value from its disclosure or use, and it is the subject of efforts that are reasonable under the circumstances to maintain its confidentiality.

61.     R2X's trade secrets provide critical commercial and competitive advantages to R2X.

62.     R2X has taken reasonable and adequate precautions to protect its trade secrets including, but not limited to, limiting access to the information to a select group of individuals on a need-to-know basis in order to perform their employment duties, and requiring employees to

sign submit to restrictive covenants and confidentiality obligations agreements as a condition of employment.

63.     R2X's trade secrets are related to its products and services used in, or intended to be used in, interstate or foreign commerce.

64.     Windsor had access to R2X's trade secrets, which were provided exclusively for the purpose of furthering R2X's business.

65.     Windsor is aware of the confidential and proprietary nature of R2X's trade secrets, and of his duty not to use such information for his own benefit, or for the benefit of any person or entity other than R2X.

66.     Windsor has willfully, wrongfully, and maliciously misappropriated R2X's trade secrets by using his knowledge of R2X's trade secret information relating to its customers to R2X's detriment.

67.     Windsor has engaged in actual and threatened misappropriation of R2X's trade secrets.

68.     R2X has suffered and will continue to suffer irreparable harm, including, but not limited to, a loss of its competitive advantage, loss of business, loss of goodwill, and other damage unless Windsor is enjoined from continuing to benefit from any unlawful misappropriation of R2X's trade secrets and confidential information.

69.     Unless restrained, Windsor will continue to misappropriate R2X trade secrets in violation of the DTSA.

70.     As a direct and proximate consequence of the conduct of Windsor, R2X has been damaged in an amount to be proven at trial.

17

71.     The conduct of Windsor was willful, malicious, and done in conscious disregard of R2X's rights, entitling R2X to exemplary damages and attorney's fees and costs in an amount to be proven at trial.

72.     Pursuant to the DTSA, R2X is entitled to preliminary and permanent injunctive relief, enjoining and restraining Windsor, from all acts of actual and threatened misappropriation of the trade secrets of R2X; and an award of compensatory damages for actual losses caused by Defendant's misappropriation of trade secrets, attorneys' fees, an award of damages for unjust enrichment caused by Defendants' misappropriation of trade secrets, and an award of exemplary damages under 18 U.S.C. § 1836(b)(3).

### COUNT II – MISAPPROPRIATION OF TRADE SECRETS UNDER THE INDIANA UNIFORM TRADE SECRETS ACT

73.     R2X realleges and incorporates by reference the allegations set forth in foregoing paragraphs as if fully set forth herein.

74.     R2X's trade secrets and confidential information are not generally available to the company's competitors and derive independent economic value from not being known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from the information's disclosure or use.

75.     R2X has taken reasonable steps to protect the secrecy of its confidential and proprietary information, including but not limited to restricting access to R2X's password-protected computer network, restricting internal access to such information to a limited pool of employees who have a "need to know" the information to perform their duties, and requiring employees to agree to employment agreements with restrictive covenants, including non-disclosure of trade secrets and confidential information.

76.     Certain of R2X's confidential information described herein constitutes trade secrets under the Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1, *et seq*. ("IUTSA").

77.     Windsor intentionally and willfully misappropriated R2X trade secrets and/or received and is in possession of R2X's trade secrets under circumstances by which he knows or has reason to know that the trade secrets were acquired by improper means.

78.     There is a continuing threat of further misappropriation and misuse of R2X's trade secrets. Unless injunctive relief is granted, the continued disclosure and use of R2X's trade secrets may be inevitable.

79.     Windsor's misappropriation and use of R2X's trade secrets has caused and will continue to cause irreparable harm and damage to R2X.

80.     R2X is entitled to injunctive relief to protect against the continued and/or imminent threat of Windsor's further misappropriation, use, and/or disclosure of R2X's trade secrets, as such misappropriation, use, and/or disclosure will continue to cause R2X substantial and irreparable harm for which there is no adequate remedy at law.

81.     R2X is entitled to damages for the harm caused by Windsor's misappropriation, use, and/or disclosure of R2X's trade secrets, including profits lost as a result of Windsor's misconduct and consequential damages.

82.     Windsor's conduct was willful, malicious, and in bad faith so as to justify an award of punitive damages in an amount that is twice the amount of actual damages, and an award of attorneys' fees under the IUTSA.

### COUNT III – BREACH OF CONTRACT AGAINST WINDSOR – PARAGRAPH 9(D) OF THE AGREEMENT – NON-SOLICITATION

83.     R2X realleges and incorporates by reference the allegations set forth in foregoing paragraphs as if fully set forth herein.

84. R2X and Windsor entered into the Agreement on or around March 13, 2023, as a condition of Windsor's employment and for other good and valuable consideration.

85. The Agreement is a valid and enforceable contract between R2X and Windsor, and is supported by adequate consideration.

86. Paragraph No. 9(d) of the Agreement prohibits Windsor, for 24 months after the cessation of his employment, from directly or indirectly, soliciting or attempting to solicit R2X customers, for the purpose of offering goods and services competitive to those offered by R2X, whom he serviced or solicited during his last 12 months of employment. Paragraph 9(d) also prohibits Windsor from soliciting certain R2X prospective customers.

87. XTC US is engaged in the third-party logistics industry and offers goods and services competitive to those offered by R2X.

88. Windsor resigned from R2X less than 24 months ago.

89. R2X performed every obligation it owed to Windsor under the Agreement, and Windsor received all the benefits and consideration relating to his employment with R2X in exchange for signing the Agreement and agreeing to be bound by its terms.

90. Windsor is now employed by XTC US.

91. Since Windsor left R2X's employment, he has directly solicited at least one R2X customer whom he serviced or solicited during his last 12 months of employment for the purpose of offering goods and services competitive to those offered by R2X. On information and belief, Windsor is continuing to solicit R2X's customers and prospective customers.

92. Windsor's conduct and threatened conduct is in direct violation of Paragraph No. 9(d) of the Agreement.

93. Windsor's breach of contract was and is willful, malicious, and done in bad faith.

94.     As a direct and proximate result of Windsor's breach, R2X has suffered and will continue to suffer irreparable harm, including but not limited to loss of competitive trade secrets and confidential information, unfair competition, loss of customers as well as the company's substantial investment in developing its customer relationships, and other non-monetary losses.

95.     Pursuant to the Agreement, R2X is entitled to preliminary and permanent injunctive relief to enforce Windsor's contractual obligations as well as to recover damages incurred as a result of Windsor's breach.

### COUNT IV – BREACH OF CONTRACT AGAINST WINDSOR – PARAGRAPH 7(C) OF THE AGREEMENT – NON-DISCLOSURE AND NON-USE OF CONFIDENTIAL INFORMATION

96.     R2X realleges and incorporates by reference the allegations set forth in foregoing paragraphs as if fully set forth herein.

97.     R2X and Windsor entered into the Agreement on or around March 13, 2023, as a condition of Windsor's employment and for other good and valuable consideration.

98.     The Agreement is a valid and enforceable contract between R2X and Windsor, and is supported by adequate consideration.

99.     Paragraph No. 7(c) of the Agreement prohibits Windsor from disclosing or using R2X's trade secrets and confidential information except as required in the performance of his previously authorized employment duties for R2X.

100.    The restrictions on use and disclosure of trade secrets and confidential information remain in effect.

101.    R2X performed every obligation it owed to Windsor under the Agreement, and Windsor received all the benefits and consideration relating to his employment with R2X in exchange for signing the Agreement and agreeing to be bound by its terms.

102.    After Windsor left R2X's employment, he used R2X's trade secrets and confidential information for his own gain and the gain of XTC, which was not required in the performance of his previously authorized employment duties.

103.    Windsor's conduct and threatened conduct is in direct violation of Paragraph No. 7(c) of the Agreement.

104.    Windsor's breach of contract was and is willful, malicious, and done in bad faith.

105.    As a direct and proximate result of Windsor's breach, R2X has suffered and will continue to suffer irreparable harm, including but not limited to loss of competitive trade secrets and confidential information, unfair competition, loss of customers as well as the company's substantial investment in developing its customer relationships, and other non-monetary losses.

106.    Pursuant to the Employment Agreement, R2X is entitled to preliminary and permanent injunctive relief to enforce Windsor's contractual obligations as well as to recover damages incurred as a result of Windsor's breach.

### COUNT V – UNFAIR COMPETITION AGAINST WINDSOR

107.    R2X realleges and incorporates by reference the allegations set forth in foregoing paragraphs as if fully set forth herein.

108.    Windsor has unfairly competed against R2X by, in violation of Windsor's legal obligations, soliciting R2X's customers and using and disclosing R2X's trade secrets and confidential information.

109.    Windsor's conduct as set forth above constitutes unfair competition with R2X.

110.    Windsor's actions were willful and wanton and carried out with a callous disregard for the interests and rights of R2X.

111.     As a direct and proximate result of Windsor's actions, R2X has suffered and will continue to suffer irreparable harm, including but not limited to loss of competitive trade secrets and confidential information, unfair competition, loss of customers as well as the company's substantial investment in developing its customer relationships, and other monetary and non-monetary losses.

112.     R2X is entitled to preliminary and permanent injunctive relief to enforce Windsor's contractual obligations as well as to recover damages incurred as a result of Windsor's conduct.

## PRAYER FOR RELIEF

WHEREFORE, R2X requests judgment in its favor and against Windsor as follows:

(a)     Entry of a preliminary and permanent injunction for a period of 24 months from the date of the Court's order barring Windsor and all persons or entities in active concert or participation with him, including XTC, from directly or indirectly soliciting, contacting, or attempting to contact or solicit R2X's current customers, which Windsor serviced or solicited during the last 12 months of his employment with R2X, for purposes of offering or accepting goods or services similar to or competitive with those offered by R2X in accordance with Paragraph 9(d) of the Agreement.

(b)     Entry of a preliminary and permanent injunction for a period of 24 months from the date of the Court's order barring Windsor and all persons or entities in active concert or participation with him from directly or indirectly soliciting, contacting, or attempting to contact or solicit R2X's prospective customers, to whom R2X has made a written or verbal proposal or solicitation for which Windsor was directly involved or had supervisory responsibility during the 12 months preceding the end of his employment with R2X, for purposes of offering or accepting

goods or services similar to or competitive with those offered by R2X in accordance with Paragraph 9(d) of the Agreement.

(c)     Entry of a preliminary and permanent injunction for a period of 12 months from the date of the Court's order barring Windsor and all persons or entities in active concert or participation with him, including XTC, from directly or indirectly disclosing or using R2X's trade secrets and confidential information except with the prior written consent of R2X's CEO and in accordance with Paragraph 7(c) of the Agreement.

(d)     Entry of a preliminary and permanent injunction directing Windsor for a period of 24 months from the date of the Court's order, to direct any of R2X's customers who contact him seeking to engage R2X's services to contact R2X's representatives.

(e)     Entry of a preliminary and permanent injunction requiring the immediate return of all R2X property, confidential information, and trade secrets or else the deletion of such by a forensic professional with the authorization, supervision, and participation of R2X.

(f)     In a preliminary and/or permanent injunction, entry of an equitable extension of the terms of the restrictive covenants to ensure R2X is made whole and receives the benefit of its bargain in the Agreement.

(g)     In a preliminary and/or permanent injunction, an accounting of all R2X's property, confidential information, and trade secrets presently or formerly in the possession, custody, or control of Windsor.

(h)     All available monetary damages, including but not limited to lost profits, compensatory damages, liquidated damages, punitive and exemplary damages, costs, and attorneys' fees.

(i)     Disgorgement of any benefits, profits, or other unjust enrichment improperly

obtained by the Defendant.

(j)     An order awarding R2X pre- and post-judgment interest.

(k)     Any and all other just and proper relief in favor of R2X.


Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By:     _s/ Todd Kaiser_____
         Todd Kaiser, Atty. No. 10846-49
         Byrin A, Romney, Atty. No. 37751-49
         300 N. Meridian Street, Suite 2700
         Indianapolis, IN  46204
         Telephone:  317-916-1300
         Facsimile:  317-916-9076
         *Todd.kaiser@ogletree.com*
         *byrin.romney@ogletree.com*

         Attorneys for Plaintiff R2X, LLC


58005796.v3-OGLETREE

# EXHIBIT A

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-A5F7-D6A874EDC606

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is entered into as of March 13, 2023 (the "Effective Date") by and between R2X LLC, d/b/a Ready-2-Xecute, an Indiana limited liability company, with a principal place of business located at 10475 Crosspoint Blvd., Suite 250, Indianapolis, Indiana 46256 ("Company"), and Austin Windsor ("Employee"), residing at 11405 Indiana Creek Road  Indianapolis, IN  46236 . Company and Employee are collectively referred to as the "Parties").

In consideration of Employee's employment or continued employment by Company as **Account Representative**, which Employee acknowledges to be good and valuable consideration for Employee's obligations hereunder, Company and Employee hereby agree as follows:

1. <u>Employment</u>. Company hereby employs or continues to employ Employee, and Employee hereby accepts employment upon the terms and conditions of this Agreement.

2. <u>Position and Duties</u>. As an **Account Representative**, Employee shall have the responsibilities set forth in the job description attached as <u>Exhibit A</u> and such other duties for Company as may from time to time be assigned by Company to Employee. Employee shall report to Company's **Account Representative**. Employee's position is a full-time position. Employee shall devote substantially all of Employee's business time and attention to the performance of Employee's duties hereunder and will use Employee's best energies and abilities in the performance of Employee's duties and responsibilities. Employee shall comply with all policies, procedures, and practices of Company as they exist from time to time, and all applicable federal, state, and local laws, regulations, and ordinances. Employee will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere with the performance of such duties, either directly or indirectly, without the prior written consent of Company's CEO.

3. <u>Compensation</u>. In consideration of Employee's services as **Account Representative**, Employee will receive the compensation set forth in <u>Exhibit B</u> attached hereto, payable in accordance with Company's customary payroll practices and applicable wage payment laws, but no less frequently than monthly, and subject to all withholdings and deductions as required or permitted by law. Company reserves the right, in its sole discretion, to prospectively modify Employee's compensation from time to time, to the extent permitted by applicable law.

4. <u>Benefits</u>. Employee will be eligible to participate in any employee benefit plans and programs in effect from time to time, as are made available to other similarly situated employees of Company, in accordance with and subject to the eligibility and other provisions of such plans and programs. Company reserves the right, in its sole discretion, to prospectively modify or terminate any of its benefit plans or programs from time to time.

5. <u>Business Expenses</u>. Employee shall be entitled to reimbursement for all reasonable, ordinary and necessary out-of-pocket business, entertainment and travel expenses incurred by Employee in

connection with the performance of Employee's duties hereunder in accordance with Company's expense reimbursement policies and procedures in effect from time to time.

      6.    <u>Employment Relationship</u>. Employee is employed by Company at-will, meaning that either Employee or Company may terminate the employment relationship at any time, with or without cause, and with or without notice. Any contrary representations, if any, that may have been made to Employee at any time prior or subsequent to the Effective Date are superseded by this Agreement. Although Employee's duties, title, compensation, and benefits, as well as Company's personnel policies and procedures, may change from time to time, the "at-will" nature of Employee's employment may only be changed in an express agreement signed by Employee and Company's CEO.

      7.    <u>Confidential Information</u>. Employee understands and acknowledges that during the course of employment by Company, Employee will have access to and learn about Confidential Information, as defined below.

      (a)    <u>Confidential Information Defined</u>. For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic, or any other form or medium, relating directly or indirectly to: business practices, plans, publications, documents, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, proprietary computer software, records, supplier information, vendor information, financial information, accounting information and records, legal information, marketing information, advertising information, pricing information, personnel information, employee lists, supplier lists, vendor lists, reports, sales information, revenue, costs, ideas, customer information and customer lists of Company or its businesses or affiliates, or any existing or prospective customer, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to Company in confidence.

      Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified or treated as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

      Employee understands and agrees that Confidential Information includes information developed by Employee in the course of Employee's employment by Company as if Company furnished the same Confidential Information to Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to Employee, provided that the disclosure is through no direct or indirect fault of Employee or person(s) acting on Employee's behalf.

      (b)    <u>Company Creation and Use of Confidential Information</u>. Employee understands and acknowledges that Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its logistical and freight brokerage services for commercial customers. Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A874FDC606

Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

(c) <u>Disclosure and Use Restrictions</u>. Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of Company) not having a need to know and authority to know and use the Confidential Information in connection with the business of Company and, in any event, not to anyone outside of the direct employ of Company except as required in the performance of Employee's authorized employment duties to Company or with the prior consent of Company's CEO in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of Company, except as required in the performance of Employee's authorized employment duties to Company or with the prior consent of Company's CEO in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

Employee understands and acknowledges that Employee's obligations under this Agreement regarding any particular Confidential Information begins immediately when Employee first has access to the Confidential Information (whether before or after beginning employment with Company) and shall continue during and after Employee's employment by Company until the time that the Confidential Information has become public knowledge other than as a result of Employee's breach of this Agreement or breach by those acting in concert with Employee or on Employee's behalf.

(d) <u>Permitted Disclosures</u>. Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Employee shall immediately provide written notice of any such order to Company's CEO.

8. <u>Security</u>.

(a) <u>Security and Access</u>. Employee agrees and covenants (i) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding computer equipment, telephone systems, voicemail systems, facilities access, key cards, access codes, internet, computer systems, email systems, computer networks, document storage systems, software, data security, firewalls, passwords and any and all other Company facilities, information technology resources, and communication technologies ("Facilities Information Technology and Access Resources"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of Employee's employment with Company, whether termination is voluntary or involuntary. Employee agrees to notify Company promptly in the event Employee learns of any violation of the foregoing by Employee or others, or of any other misappropriation or unauthorized access, use,

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Company property or materials by others.

(b)     Exit Obligations. Upon (i) voluntary or involuntary termination of Employee's employment or (ii) Company's request at any time during Employee's employment, Employee shall (a) provide or return to Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, smartphones, equipment, manuals, reports, files, books, compilations, work product, email messages, recordings, disks, thumb drives, or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information, that are in the possession or control of Employee, whether they were provided to Employee by Company or any of its business associates or created by Employee in connection with Employee's employment by Company; and (b) delete or destroy all copies of any such documents and materials not returned to Company that remain in Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in Employee's possession or control, certifying such deletion or destruction in writing.

9.     Restrictive Covenants.

(a)     Acknowledgment. Employee understands that the nature of Employee's position gives Employee access to and knowledge of Confidential Information and places Employee in a position of trust and confidence with Company. Employee acknowledges that Company provides logistical and freight brokerage services to commercial customers across the continental United States, Canada and Mexico, and that Company's business and Employee's service on behalf of Company are not limited to any specific geographic territory within the continental United States, Canada and Mexico. Employee further understands and acknowledges that Company's ability to reserve Confidential Information for the exclusive knowledge and use of Company is of great competitive importance and commercial value to Company, and that improper use or disclosure by Employee is likely to result in unfair or unlawful competitive activity. If Employee is engaged in a sales position, Employee further understands and acknowledges that Employee's primary responsibilities include developing new business for Company by promoting and soliciting the sale of Company's services to prospective and existing customers, and initiating and attending sales calls and meetings with prospective and existing customers, resulting in Employee developing and maintaining critical relationships necessary for the success and growth of Company's business.

(b)     Non-Competition. Because of Company's legitimate business interest as described in this Agreement and the good and valuable consideration offered to Employee, the receipt and sufficiency of which is acknowledged, during the term of Employee's employment and for a period of 24 months thereafter, beginning on the last day of Employee's employment with Company, whether terminated for any reason or no reason, by Employee or Company (the "Restricted Period"), Employee agrees and covenants not to engage in Prohibited Activity (defined below) in the logistical and freight brokerage services industry, including warehousing, fulfillment, product delivery and general freight management solutions for commercial customers within the continental United States, Canada and Mexico.

For purposes of this non-compete clause, "Prohibited Activity" is activity in which Employee contributes Employee's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, advisor, consultant, contractor, agent, or any other similar

capacity related, in whole or in part, to Employee's duties and responsibilities while employed by Company, to an entity engaged in the same or similar business as Company, including those engaged in the business of providing logistical and freight brokerage services, for commercial customers that compete with the logistical and freight brokerage services offered by Company or any affiliate of Company within the continental United States, Canada and Mexico. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

Nothing in this Agreement shall prohibit Employee from purchasing or owning less than two percent of the publicly traded securities of any corporation, provided that such ownership represents a passive investment, and that Employee is not a controlling person of, or a member of a group that controls, such corporation.

This Section does not, in any way, restrict or impede Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. Employee shall promptly provide written notice of any such order to Company's CEO.

(c)  Non-Solicitation of Employees. Employee understands and acknowledges that Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to Company. Employee agrees and covenants not to directly or indirectly (a) solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of Company or any employee who has been employed by Company in the 12 months preceding the last day of Employee's employment (collectively, "Covered Employee"), or (b) induce the termination of employment of any Covered Employee during the Restricted Period.

This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if Employee merely updates Employee's LinkedIn profile or connects with a Covered Employee on Facebook, LinkedIn, or other social media platform without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this Section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, Employee from exercising protected rights that cannot be waived by agreement. Furthermore, this Section shall not be deemed to prohibit Employee from continuing or commencing a personal relationship or non-competitive business relationship.

(d)  Non-Solicitation of Customers. Employee understands and acknowledges that because of Employee's experience with and relationship to Company, Employee will have access to and will learn about much or all of Company's customer information, including, but not limited to, customer contact names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's sales.

Employee understands and acknowledges that: (i) Company's relationships with its customers is of great competitive value; (ii) Company has invested and continues to invest

substantial resources in developing and preserving its customer relationships and goodwill; (iii) Employee's responsibilities include providing services to and/or for the benefit of Company's customers for the duration of the customer's relationship with Employer, and (iv) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to Company.

Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this Agreement, or meet with Company's current or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by Company. However, it will not be deemed a violation of this Agreement if Employee merely updates Employee's LinkedIn profile, or connects with a covered customer or former customer on Facebook or LinkedIn, without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This restriction shall only apply to: (i) customers Employee serviced or solicited during the last 12 months of Employee's employment with Company, and (ii) prospective customers to whom Company has made a written or verbal proposal or solicitation for which Employee was directly involved or had supervisory responsibility during the 12 months preceding the end of Employee's employment with Company.

10.   <u>Non-Disparagement</u>. The Parties agree and covenant that they will not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the other or their respective employees, officers, and existing and prospective customers, suppliers, investors, and other associated third parties. This Section does not, in any way, restrict or impede either Employee or Company from exercising protected rights to the extent that such rights cannot be waived by agreement, including to communicate with any administrative or regulatory agency to report suspected unlawful conduct or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

11.   <u>Acknowledgment</u>. Employee acknowledges and agrees that: (i) Employee's services to be rendered to Company are of a special and unique character; (ii) that Employee will obtain knowledge and skill relevant to Company's industry, methods of doing business, and marketing strategies by virtue of Employee's employment; (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of Company; and (iv) that Employee will be reasonably able to earn a living without violating the terms of this Agreement; and (v) that Employee has the right to consult with counsel before signing this Agreement.

Employee further acknowledges that: (i) the amount of Employee's compensation reflects, in part, Employee's obligations and Company's rights under this Agreement; (ii) Employee has no expectation of any additional compensation, bonus, or other payment of any kind not otherwise referenced herein in connection herewith; and (iii) Employee will not be subject to undue hardship by reason of Employee's full compliance with the terms and conditions of this Agreement or Company's enforcement thereof; and (iv) this Agreement is not a contract of employment and shall not be construed as a commitment by either Party to continue an employment relationship for any certain period of time.

**Nothing in this Agreement shall be construed to in any way terminate, supersede, undermine, or otherwise modify the "at-will" status of the employment relationship between Company and Employee, pursuant to which either Company or Employee may terminate the employment relationship at any time, with or without cause, and with or without notice.**

12.    <u>Remedies</u>. In the event of a breach or threatened breach by Employee of any of the provisions of this Agreement, Employee hereby consents and agrees that money damages would not afford an adequate remedy and that Company shall be entitled to seek a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available relief.

13.    <u>Successors and Assigns</u>.

(a)    <u>Assignment by Company</u>. Company may assign this Agreement to any affiliate, or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of Company. This Agreement shall inure to the benefit of Company and permitted successors and assigns.

(b)    <u>No Assignment by Employee</u>. This Agreement is personal to Employee and Employee may not assign this Agreement or any part hereof. Any purported assignment by Employee shall be null and void from the initial date of purported assignment.

14.    <u>Warranty</u>. Employee represents and warrants that Employee is not a party to any non-compete restrictive covenant or related contractual limitation that would interfere with or hinder Employee's ability to undertake the obligations and expectations of employment with Company.

15.    <u>Choice of Law and Forum Selection</u>. This Agreement, and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute, are governed by, and construed in accordance with, the laws of the State of Indiana, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the laws of any jurisdiction other than the State of Indiana to apply. Any action or proceeding by either Party to enforce this Agreement shall be brought only in any state or federal court located in or serving Marion County, Indiana. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

16.    <u>Entire Agreement</u>. Unless specifically provided herein, this Agreement and all exhibits attached hereto contain all the understandings and representations between Employee and Company pertaining to the subject matter hereof and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

17.  <u>Modification and Waiver</u>. No provision of this Agreement may be amended or modified unless the amendment or modification is agreed to in writing and signed by Employee and by Company's CEO. No waiver by either Party of any breach of any condition or provision of this Agreement to be performed by the other Party shall be deemed a waiver of any other provision or condition at the same or any prior or subsequent time.

18.  <u>Severability</u>. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, that holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding on the Parties with any modification to become a part of and treated as though originally set forth in this Agreement.

The Parties further agree that any such court is expressly authorized to modify any unenforceable provision of this Agreement instead of severing the unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making any other modifications it deems warranted to carry out the intent and agreement of the Parties as embodied in this Agreement to the maximum extent permitted by law.

The Parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. Should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, that invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, and if such  provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth in this Agreement.

19.  <u>Captions</u>. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

20.  <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

21.  <u>Tolling</u>. If Employee violates any of the terms of the restrictive covenant obligations in this Agreement, the Restricted Period for all such restrictions shall automatically be extended by the period Employee was in violation of them.

22.  <u>Attorneys' Fees</u>. If Employee breaches any of the terms of the restrictive covenant obligations in this Agreement, to the extent authorized by state law, Employee will be responsible for payment of all reasonable attorneys' fees and costs Company incurred in the course of enforcing the terms

of the Agreement, including demonstrating the existence of a breach and any other contract enforcement efforts.

23.   <u>Notice</u>. If and when Employee's employment with Company terminates, whether voluntarily or involuntarily, Employee agrees to provide to any subsequent employer a copy of this Agreement. In addition, Employee authorizes Company to provide a copy of this Agreement to third parties, including but not limited to, Employee's subsequent, anticipated, or possible future employer.

24.   <u>Survival</u>. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the Parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the Parties under this Agreement.

25.   <u>Acknowledgement of Full Understanding</u>. EMPLOYEE ACKNOWLEDGES AND AGREES THAT EMPLOYEE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. EMPLOYEE ACKNOWLEDGES AND AGREES THAT EMPLOYEE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date above.

**"Company"**

R2X LLC dba Ready-2-Xecute

By:
Joel Hale, Chief Executive Officer

**"Employee"**

Austin Windsor                                    3/22/2023 | 11:40:44 PDT
7A69F572100046A...

Austin Windsor

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A874EDC606

Exhibit A

# Account Representative

# Job Description

As an Account Representative for R2X LLC (Ready-2-Xecute), you will be responsible for supporting and working with an established National Account Manager (NAM) to drive revenue. The Account Representative is focused on identifying and growing new and existing business by presenting READY-2-XECUTE customers with our newest transportation services.

**What you'll be doing:**

- Report to National Account Manager
- Direct (secondary) contact with each Regional Transportation Manager and key decision makers
- Customer facing
- Securing Freight
  - Answer coverage emails
  - Quote on Freight Allocation Module
  - Proactively reach out about freight opportunities
- Operations and service quality that ensure:
  - All customer emails are answered within a timely manner
  - All loads are covered
  - All covered loads have Macropoint, correct Planning Comment, and appropriate call in notes
  - All loads are fully progressed from pick up to delivery
  - All loads in delivered status have paperwork collection progression
  - Direct Carrier Operations is marking loads ready to bill in a timely manner
  - Be aware of customer KPI's and work to reach/ overachieve them
- Handle and solve complex problems
  - Handle returns/ diversions directly with customer
  - Handle pick-up/delivery issues
  - Handle difficult carriers
  - Handle claims with customer
  - Handle billing issues directly with Ready-2-Xecute billing team
- Stay up to date with market conditions
  - Set appropriate price targets
  - Know when to lower or raise price targets based on capacity
  - Make final decision on appropriate price to book loads
  - Handle RFP's
  - Report to National Account Manager if any drastic rate changes are needed
- Delegate task to DCO as needed
- Take responsibility of FRT (assigned Freight Revenue Code) performance
- Responsible for after hour escalations, can delegate to DCO (Dedicated Carrier Operations)

<u>Exhibit B</u>

**2023 Incentive Compensation Plan**
**Account Representative**

**Section I.          Purpose**

R2X LLC ("Company") 2023 Incentive Compensation Plan for Account Representative ("Plan"), including Section II. ("Incentive Structure") sets forth each covered Participant's agreement with Company regarding incentive compensation and the other matters set forth in the Plan. It is the responsibility of the Employee ("Participant") to carefully read this Plan.

**Section II.          Incentive Structure**

The following job title is covered under this Plan:

- Account Representative

**Plan Design**

Incentive compensation shall be comprised of Participant's Incentive Payment determined in accordance with this Section.

**Incentive Compensation Components**

Account Representative compensation is composed of a Base Salary plus incentive compensation (Commission). There is no maximum compensation amount under the terms of this Plan.

| Plan Component | Commission Rate | Maximum Annual Incentive | Payout Frequency |
|---|---|---|---|
| Commission - Collected Paid Freight Margin of assigned FRT code | Percentage of the collected freight margin earned on Collected Paid Freight of assigned FRT code. Commission amount is based on a tiered structure illustrated below | Unlimited | Monthly |

| Account Representative Commission Tiers | | | |
|---|---|---|---|
| Collected Paid Freight Margin | | | Commission % Earned |
| $             - | TO | $             25,000.00 | 3% |
| $        25,000.01 | TO | UNLIMITED | 11% |

**Commission – Collected Paid Posted Freight Margin**

**Definition:**  Commission is defined as pay based on a percentage of the collected paid and posted freight margin of assigned Freight Revenue Code (FRT)

**Performance Period:**  Each calendar month is a Performance Period under the Plan

**Collected Paid Freight Margin:** The amount received and posted, from a customer, as a payment in full for the amount input into Company TMS and billed to customer.

**Account Representative - Compensation**

Participant will be compensated on a salary plus commission basis. Participant's commissions will be based on a percentage of "Collected Paid Posted Freight Margin" each month, and the commission rate will be based on a fixed rate percentage of Collected Paid Posted Freight Margin on assigned FRT. The "Collected Paid Posted Freight Margin" is determined by Participant's PAID freight bills for the preceding month(s), including any layover and detention pay, less the freight cost paid to the trucking companies and any additional expenses. Collected Paid Posted Freight Margin is determined monthly, and commissions are paid on the last payday of the month following the month for which the Collected Paid Posted Freight Margin has been determined and posted to Customer's Account.

For example, if Participant's Collected Paid Posted Freight Margin for October is $70,000.00, Participant's commission will be $7,700.00 paid to Participant (70,000.00*.11=$7,700.00). If Participant's Collected Paid Posted Freight Margin for November is $130,000.00, Participant's commission will be $14,300.00 paid to Employee (130,000.00*.11=$14,300.00).

All salary and commission payments are subject to withholdings and deductions as required or permitted by law.

**Exceptions to Compensation**

A. It is expected that the compensation plan will be adhered to as written. Any exceptions to the Plan will be reviewed in accordance with the guidance of Company's Executive Team.
B. Management Discretion will be used to protect Company from unjustifiable compensation expenses.
C. If the Participant should be assigned to a new position, then the Participant shall be entitled and paid for commissions earned in accordance with the terms of this Incentive Compensation Plan.
D. Negative commissions will be carried forward and collected from commissions earned in the following months until all negative commissions are collected by Company prior to any positive commission paid out.
E. The determination shall be at the sole discretion of the Company's CEO.
F. Any manipulation on behalf of Participant(s), in an attempt to obtain and/or increase a higher commission earnings, will result in disciplinary action up to and including termination. In any such case Participant(s) will forfeit all commission payouts.
G. No commissions will be paid on any of the following loads:
   a. Paperwork has not been received by operations within 25 days of delivery date - BOL/TEAM and Receipts
   b. Loads that have not received payment in full that is equal to the amount input in TMS and billed.
   c. Loads which contain false or incomplete information.

H. Losses / Claims on loads will be audited for accurate and detailed required load information specific to the customer's requirements. If it is deemed that the specific required information was not entered into the Company's TMS system and the requirements were not provided to the carrier, then the loss or claim shall be the responsibility of the FRT for which the customer is assigned.

**Plan Provisions/Operational Terms and Definitions**

**<u>Active Employment.</u>**    Performing, in good faith, all the material duties and responsibilities of your job with Company in a position covered by Section II. of this Plan. Participant must be actively employed on the last day of the performance period to be eligible for incentive compensation payment.

**<u>Closed Business.</u>** Business entered in the applicable line of business system and eligible for calculation of Incentive Compensation pursuant to Section II. during Participant's Active Employment.

     I. **<u>Definition of Closed Business specific to this Plan</u>**
- **a.** Receipt of Freight Tender from customer
- **b.** Load created in system with Load # and Tender attached.
- **c.** Receipt of Freight Bill and Proof of Delivery with Receiving Party Signatures
- **d.** Completed Freight Bill Submitted to Billing Department along with any additional accessorial receipts.
- **e.** Payment received and posted by Accounts Receivable Department into system.

**<u>Effective Date.</u>** This Plan is effective April 1, 2023, through January 31, 2024, or such subsequent date that a new Incentive Compensation Plan becomes effective or until modified or terminated by Company pursuant to the term of the Plan.

**<u>Incentive Payment or Incentives.</u>** Amounts eligible for payment during Active Employment under this Plan by Participant pursuant to the calculations set forth in Section II.

**<u>Incentive Payment Date.</u>** Incentive Payment(s) shall be made in accordance with Company's regular payroll processes and Incentive Payment will be processed on the last pay date of each month for the prior month's collected posted paid freight.

**<u>Termination of Employment.</u>** The separation of Participant from employment with Company regardless of whether the reason for termination was voluntary, involuntary, reduction of force, or any other reason for ending employment.

**Section III.    Eligibility for Incentive Payments**

**A. Plan Acknowledgment**

Participant's signature and initials on this Agreement shall be construed as Acknowledgment of Incentive Plan and qualifications to receive Incentive Payments under this Plan. Participant acknowledges and agrees, with the exception of a written modification signed by the Company's CEO, no statements or communications, whether oral or written, will modify Agreement or Incentive Plan.

**B. Active Employment**

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A874EDC606

Participants must meet the definition of Active Employment the last day of the Performance Period in a position covered under the Plan to receive Incentive Payment. No credit will be given for any Closed Business after the last day of Active Employment.

### C.  Participant Responsibility

Incentive Payment(s) will be based on data contained in the official line of business sales system or other applicable tracking systems; therefore, if Participant enters data into a system, it is the responsibility of each Participant to correctly input all related information into the system. Participants are responsible for auditing all applicable systems for errors and must immediately notify Company of any errors. Participant will be deemed to have agreed to the accuracy of the Incentive Payment and no adjustments will be made based on errors asserted by Participant.

### D.  Plan Modification

This Plan may be modified, in whole or in part, or terminated prior to the end of the Plan's term by Company upon giving ten (10) days' notice to Participant. Incentives earned will be calculated pursuant to this Plan for all Closed Business (as defined in Section II.) prior to the modification or termination of the Plan. No modification or waiver of any provision of this Plan shall be valid unless in writing and signed by Company's CEO and any waiver shall only be valid as to the specific circumstances for which it was given.

DocuSigned by:

*Austin Windsor*                    3/22/2023 | 11:40:44 PDT
_____
7A69F572196948A...

Employee Signature                   Date

Austin Windsor
_____
Printed


Joel Hale, CEO

# EXHIBIT B



**Kate G. Erdel**

kate.erdel@dentons.com
D    +1 317 968 5339

Dentons Bingham Greenebaum LLP
212 West Sixth Street
Jasper, IN  47546
United States

dentons.com

May 18, 2023

Via Regular US Mail and Email: whaut@dblaw.com

William D. Haut
Densborn Blachly LLP
500 East 96th Street , Suite 100
Indianapolis, IN 46240

Re:      Cease and Desist Letters to XTC US Xpress, Inc.'s Employees

Dear Mr. Haut:

Dentons Bingham Greenebaum LLP ("Dentons") represents XTC US Xpress, Inc. ("XTC") with respect to the cease and desist letters your office recently sent to XTC via cc: to its president, Brad Barges. At the outset, please note that Dentons has not been retained to represent any of the individual recipients of your letters, and this letter is not intended to serve as a response on their behalf. Rather, the purpose of this letter is to provide you with several points of additional information regarding the matter and XTC's position.

First, XTC received copies of letters your office sent to Martin Romero, Mathew Baquero Intriago, Patrick Sturm, Sean Compton, and Andrew Karlander. We also understand that your office sent a similar letter to Kayla Compton, though XTC has not yet received a copy. Please note that XTC terminated Mr. Sturm on May 12, 2023 and Mr. Romero has never been employed by XTC. Otherwise, Mr. Intriago, Mr. Sturm, Mr. Compton, Mr. Karlander, and Ms. Compton (collectively "the employees", each an "employee"), each – after apparently being dissatisfied with the terms and conditions of their employment with your client, R2X LLC ("R2X") – voluntarily resigned and then sought new employment with XTC. Upon accepting new employment with XTC, each of the employees experienced a demotion in terms of job title and a reduction in pay. For example, Mr. Compton, whose job title with R2X was Operations Manager, is now working for XTC in the role of Dispatch Support. Mr. Intriago and Mr. Karlander are similarly filling the role of Dispatch Support for XTC. Ms. Compton's job title with XTC is Billing Administrator.

Second, we understand from your letter that each employee is purportedly subject to the ongoing terms of the Employment Agreements they signed during their tenure with R2X. XTC respects the goal and intent of such agreements, but, in this case, we do not believe that there is any support for R2X's conclusion that any one of the employees is in breach of his or her Employment Agreement.

Specifically, XTC is not aware what "Confidential Information" that belongs to R2X any of the employees could conceivably have. Even if the employees do have knowledge about R2X's business and specifically about its customers, as noted in your letter, XTC is not aware of the employees having any documents or files in their possession, or of having taken any steps to use or disclose such information to XTC. XTC is



also not aware of the employees taking any steps to solicit R2X employees or customers in breach of their Employment Agreements. Rather, the employees are providing basic services to XTC that primarily include calling transportation companies to arrange freight forwarding for XTC's existing customers. To the extent that the Employment Agreements may purport to prohibit such employment, such covenants are overly broad and likely unenforceable because they do not seek to protect confidential or trade secret information, or preserve any other protectable interest.

Further, XTC's company policies prohibit improper conduct with respect to third-party information, and the company takes steps to secure employee compliance with those policies. For example, each of the employees in this case signed, at the outset of his or her employment with XTC, an XTC Employment Agreement that includes the following clause:

> 19. **Third Party Information.** Employee agrees that during Employee's employment with Employer, Employee shall not improperly use or disclose any trade secrets or other confidential or proprietary information of any third party (including any former employer) and shall not bring onto Employer's premises any unpublished document or proprietary information belonging to any such third party without such third party's prior written consent.

These facts do not suggest that the employees left R2X with the intent to unfairly compete, or that they are actually doing so on their own accord or at XTC's behest. Rather, it appears that the employees at issue were simply seeking new and perhaps better opportunities to make a living in a familiar field, and XTC is giving them that chance. XTC has and will continue engage in its business fairly, and expects its employees to do the same.

I hope that this letter fully addresses your client's concerns. Of course, if you have any additional information or details that you'd like to share regarding the employees and their conduct with respect to XTC, please do not hesitate to reach out and share that with me.

Thank you.

Sincerely,

*K G Erdel*

Kate G. Erdel

KE:ke

# EXHIBIT C

**Subject:**                    FW: Freight Opportunities

**From:** Austin Windsor <austin@xtcusxpress.com>
**Sent:** Wednesday, July 12, 2023 11:39 AM
**To:** ███████████████████████████████ >
**Cc:** Laurie Collins <Laurie@xtcusxpress.com>; dispatch@xtcusxpress.com
**Subject:** Freight Opportunities

Good afternoon, ████ –

My name is Austin Windsor and we have worked together in the past. I enjoyed our relationship and wanted to bring my new company to your attention. I think we would be a great fit for your organization.

I represent XTC U.S. Xpress. I am based in Indianapolis…….we have another U.S. office in Chicago…….our Canadian sister company XTC Logistics has 2 Canadian locations. One is in Amherstburg, Ontario. We are there for the sole purpose of servicing the ███████████ plant. We deliver ██████████ from this plant to all lower 48 states. We also service ████ out Bolingbrook IL Plainfield IL Detroit MI and Camden NJ Relay MD.

Picking up on Time and delivering Ontime is our mission. Strong communication both verbally and electronically is a cornerstone of our business.

Here are some quick highlights:

1. We service the ████ plant in Indianapolis facilitating deliveries to many of their customers such as ████……..we run ███████████████ to Louisville KY and Cincinnati OH
2. We service ████ in Franklin Indiana…….again ███████ ( cross border and domestic U.S.)
3. We service ████ ( ███████████████████ ) throughout Canada and the United States……..approx. 10,000 annual shipments.
4. We work with ████ as a CSP for some team lanes and single driver lanes, and some of their ISP stuff as well.
5. We are a "A+" rated carrier with ███████ and run a lot of their local relay loads in the Midwest.
6. WE are the sole provider of ██████████ to Canada from ███████.
7. Other ████ plants we service are Wytheville VA. Atlanta GA. Mountain Top PA. Carlisle PA. Cincinnati OH Detroit MI Memphis TN
8. Other ████ plants are Ames IA Nicholasville KY Itasca IL Allentown PA Blythewood SC Buffalo NY Wytheville VA.
9. WE have high level metric performance standards. We are held accountable not only by our customers but internally. We have weekly calls with customers to discuss performance / problems/ service failures if any. We can initiate corrective actions in any problem area. This is followed by internal Operations meetings to discuss performance standards.

Myself and my team, including Laurie Collins who is added here, have also been working with ███████████ and the team in Pennsylvania to get set up there, but they are currently in a holding pattern with current carriers. We have also spoken with the team in Anderson as we are based in Indy, and this is how we ended up reaching out to you.

I know ██████████ has already awarded their lanes this year but am offering you better rates than your current providers and a team of guys that have worked with the ████ directly in previous years.

I know you need to be loyal to your current carriers, but busy season is here, and we are looking to get involved on a few lanes to show you what we have to offer after working extremely hard to get to this point.

We have our own equipment that I know would assist your Mid Atlantic team and Midwest now that things are starting to ramp up for Summer.

How can we get involved on some of your more difficult lanes?  We don't mind helping as a backup either.

We have 7 guys working together, directly on our ███████████ business @ our Indianapolis office that know exactly how ████ operates, know your procedures, and know your lanes. We also have several folks from another carrier partner of ████ that are wanting to join our team, and we feel that would be a great fit over here if we were to come on board. I am certain we would be an asset to you and your team.

I know we are headed into a long weekend, and I wanted to get this in front of you before that. If you have time to jump on a quick call either today, or anytime next week, do not hesitate to reach out.  I am available pretty much anytime, as is our management team and owner, Brad Barges.

If you would get back to me when you get a moment, we would appreciate it.  See attached business proposal for ███  ███.

*Austin Windsor* | **Dispatch Support**
*XTC US Xpress Inc.*
317-454-8165 Ext 407
austin@xtcusxpress.com

Head Office: 101 W Ohio St. Ste #1601 | Indianapolis, IN 46204
dispatch@xtcustransportation.com | **https://www.xtcustransportation.com/**

Send ALL invoices & pod's to:  pod@xtcusxpress.com
Payment inquiries to:  apus@xtcusxpress.com



 

 

***** Contact XTC US Xpress Inc. 24/7 with any problems *****

# EXHIBIT D



# DENSBORN BLACHLY LLP

WILLIAM D. HAUT
Direct Dial:  (317) 669-0130
whaut@dblaw.com

July 14, 2023

*Via First Class U.S. Mail*
*and Email: kate.erdel@dentons.com*

Kate G. Erdel
Dentons Bingham Greenbaum LLP
212 West Sixth Street
Jasper, IN 47546

       Re:     XTC US Xpress, Inc. – Raiding R2X, LLC Employees and Tortious Interference with Contracts

Dear Ms. Erdel:

As you know, our firm represents R2X, LLC ("R2X"). In light of your May 18, 2023 response on behalf of XTC US Xpress, Inc. ("XTC"), we assume your firm continues to represent XTC. If that is not the case, please let us know as soon as possible.

We are writing to inform you that XTC recently hired yet another former R2X employee, Austin Windsor, to work in XTC's relatively new Indianapolis office. At this time, R2X is aware that XTC has hired at least nine former R2X employees, including recently hired Mr. Windsor and Patrick Sturm; you previously reported that Mr. Sturm was terminated by XTC on May 12, 2023. To R2X's knowledge, the following eight former R2X employees currently work at XTC's Indianapolis office: Laurie Collins, George Lowe, Riley Germin, Matthew Intriago, Sean Compton, Andrew Karlendar, Kayla Compton, and Austin Windsor.

We do not know whether XTC has shared with you the history of its newer Indianapolis office, but since 2021, XTC has contracted with R2X to secure carriers to transport loads for XTC's customers as XTC did not have the staff and resources to do so. As a result, R2X was instrumental in helping XTC launch its new office. In demonstration for its gratitude for such support, XTC raids R2X's employees by soliciting them directly and/or indirectly through its newly-hired former R2X employees in violation of R2X's employment agreements with them (copies of which were provided to XTC). Also and despite representations to the contrary in your May response, R2X has learned that XTC is actively participating in the solicitation of R2X customers with former R2X employees, purposely and intentionally interfering with employment agreements in place between the former R2X employees and R2X. As a direct and proximate result of XTC's conduct, R2X has been damaged by, among other things, the loss of revenue, customer relationships, goodwill, and fair competition.

R2X's investigation into the conduct of its former employees and XTC continues. At this time, R2X demands that XTC: (1) immediately terminate all former R2X employees, and (2) fully compensate R2X for all damages R2X has sustained as a result of XTC's unlawful conduct. It is R2X's expectation that XTC will take and complete all such action no later than July 21, 2023. If XTC fails to do so or otherwise come up with some other reasonable solution, R2X will prepare a complaint and motion for injunctive relief seeking all available damages and remedies against former R2X employees and XTC for their unlawful conduct, which will include all costs and attorney's fees incurred by R2X.

Kate Erdel
July 14, 2023
Page 2 of 2

We look forward to receipt of your response no later than July 21, 2023 at 5:00 pm ET.

Sincerely,

DENSBORN BLACHLY, LLP

William D. Haut

WDH/cdb

cc:     Joel Cox
        Joel Hale
        Khris Hale
        Eric D. Schmadeke

4884-0792-8432, v. 3

# EXHIBIT E



| | **Kate G. Erdel** | Dentons Bingham Greenebaum LLP |
|---|---|---|
| | kate.erdel@dentons.com | 2700 Market Tower |
| | D    +1 317 968 5339 | 10 West Market Street |
| | | Indianapolis, IN 46204 |

dentons.com

July 20, 2023

Via Regular US Mail and Email: whaut@dblaw.com

William D. Haut
Densborn Blachly LLP
500 East 96th Street , Suite 100
Indianapolis, IN 46240

Re:      Additional Cease and Desist Letters and Contact with XTC US Xpress, Inc. Personnel

Dear Mr. Haut:

As you know, Dentons Bingham Greenebaum LLP ("Dentons") represents XTC US Xpress, Inc. ("XTC") with respect to the cease and desist letter your office recently sent to XTC via cc: to its president, Brad Barges, and the letter your office sent directly to me on July 14, 2023 related to your client, R2X LLC ("R2X"). At the outset, please note that Dentons has not been retained to represent any of the individual recipients of your letters, and this letter is not intended to serve as a response on their behalf. However, we continue to respond with respect to XTC's position on this matter.

In addition to the prior letters your office sent to Martin Romero, Mathew Baquero Intriago, Patrick Sturm, Sean Compton, and Andrew Karlander, and perhaps also Kayla Compton, we are now also in receipt of the letter to Austin Windsor. XTC's position as to Mr. Windsor (and any other prior R2X employee) is the same as its position with respect to the other employees already discussed; each – after apparently being dissatisfied with the terms and conditions of their employment with R2X – voluntarily resigned and then sought new employment with XTC. I remain unclear as to what "Confidential Information" R2X believes that its former employees have and, even if such information is in their possession, XTC has no interest in it and I'm not aware of any steps XTC has taken to acquire, much less use, such information. It also appears that R2X is confused as to who exactly its former employees are, as Laurie Collins denies having ever worked for R2x. Most importantly, you have not provided and I have not otherwise seen any evidence to suggest that XTC has improperly solicited R2X's former employees or otherwise interfered with R2X's employment or business relationships. Accordingly, it goes without saying that XTC denies that it has engaged in any improper, much less illegal, conduct.

Further, to the extent that R2X purports that any section of its Employment Agreements with its former employees prohibits them from working for a competitor like XTC, that reading is overbroad and unenforceable because it prohibits ordinary employees from working in their field of choice, without the required legitimate protectable interest. Accordingly, R2X's letters to former employees who now work for XTC are unnecessary, and R2X's demand that XTC terminate their employment ridiculous. There is simply

Zaanouni Law Firm & Associates ► LuatViet ► Fernanda Lopes & Associados ► Guevara & Gutierrez ► Paz Horowitz Abogados ► Sirote ► Adepetun Caxton-Martins Agbor & Segun ► Davis Brown ► East African Law Chambers ► For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

 dentons.com

**July 20, 2023**
Page 2

no evidence that you've presented or that I've otherwise seen to support R2X's position. Rather, XTC is building its success – including with individuals who voluntarily seek employment with the company and with customers – on its own efforts. Any "damages" R2X claims to have sustained are unattributable to XTC. Of course, if you have actual evidence to the contrary, please provide it to me promptly.

Assuming that you will be unable to do so, and in light of R2X President Joel Hale's threatening and harassing calls to members of XTC's leadership team (which must stop immediately), XTC's suggested reasonable solution is that R2X back down, rethink its campaign against XTC, and focus on its own business. Please advise if a phone call would be useful.

Thank you.

Sincerely,

Kate G. Erdel

KE:ke

23009589.v1

# EXHIBIT F



D E N S B O R N   B L A C H L Y   L L P

**WILLIAM D. HAUT**
Direct Dial:  (317) 669-0130
whaut@dblaw.com

July 14, 2023

| | |
|---|---|
| **Certified Article Number** | |
| 9414 7266 9904 2180 3153 75 | |
| **SENDER'S RECORD** | |

*Via Certified Mail*
*Return Receipt Requested*

Austin Windsor
11405 Indiana Creek Road
Indianapolis, IN 46236

Re:     Cease and Desist – Breach of Employment Agreement effective March 13, 2023 (the "Agreement")

Dear Mr. Windsor:

This law firm represents R2X LLC (the "Company"). The Company recently learned that you breached your ongoing obligations under the Agreement as a result of your employment with, and activities on behalf of, XTC US Express, Inc. ("XTC"), also located in Indianapolis and a competitor to the Company. Among your violations, you are actively soliciting the Company's customers in violation of your Agreement. The Company's investigation is continuing, and the Company would like to impress upon you the importance of complying with your ongoing obligations under the Agreement, a copy of which accompanies this letter.

Please consult the Agreement for the entirety of your ongoing obligations. Your obligations to the Company under the Agreement include the following provisions.

- <u>Not Use or Disclose Company Confidential Information</u>. Under Section 7 of the Agreement, you agreed, among other provisions, not to directly or indirectly disclose or use the Company's Confidential Information other than as required in the performance of you work for the Company. This means, for example, that you may not use or disclose the Company's customer list or other customer information for your own benefit of or the benefit of third parties, such as XTC. In addition to your confidentiality obligations under the Agreement, your actions violate Indiana Code § 24-2-3, commonly known as the "Indiana Trade Secrets Act."

- <u>Avoid Competing With The Company</u>. Under Section 9(b) of the Agreement, you agreed that for a period of two years following termination of your employment with the Company on June 30, 2023, that you would not contribute your knowledge related to your duties and responsibilities for the Company to an entity engaged in the same or similar business as the Company in any county in which the Company is providing freight brokerage services, delivery or warehousing solutions at the time your employment ended (as further described in the Agreement). Your employment and activities with XTC violate your commitment.

- <u>Avoid Soliciting Company Employees</u>. Under Section 9(c) of the Agreement, you agreed, among other provisions, that for a period of two years following termination of your employment with the Company that you would not, directly or indirectly, solicit, hire, or

Austin Windsor
July 14, 2023
Page 2 of 2

recruit any of the Company's employees that were employed by the Company during the 12 months preceding your departure. If you have solicited any such Company employees to work for XTC, you will be in direct violation of your commitments to the Company, exposing you to financial damages and injunctive relief.

• *Avoid Soliciting Company Customers*. Under Section 9(d) of the Agreement, you agreed, among other provisions, that for a period of two years following termination of your employment with the Company that you would not, directly or indirectly, solicit or contact the Company's current or prospective customers that you worked with on behalf of the Company. Soliciting or brokering freight services through XTC for Company customers and prospective customers, is a direct violation of your commitments to the Company, exposing you to substantial financial damages and injunctive relief.

The Company wishes you well in the next chapter of your professional career, but it will not allow you to unlawfully use its trade secrets and violate your obligations under the Agreement.

Please note that in addition to the financial damages the Company will seek to recover for the breach of your obligations under the Agreement, you agreed to pay all reasonable attorneys' fees incurred by the Company to enforce the terms of the Agreement and the Company will seek to recover all such fees.

As you authorized in the Agreement, the Company may provide a copy of the Agreement to third parties, such as XTC, making them aware of your ongoing obligations.

The Company expects you to immediately cease and desist from all wrongful conduct in violation of your ongoing obligations under the Agreement and applicable law, including termination of your employment with XTC. Failure to do so will result in further action by the Company, which will include a lawsuit seeking monetary damages and an immediate order putting an end to your wrongful conduct. We trust that such action will not be necessary.

Sincerely,

DENSBORN BLACHLY, LLP

William D. Haut

WDH/cdb
Encl.

cc:     Joel Cox via email (w/o Encl.)
        Joel Hale via email (w/o Encl.)
        Khris Hale via email (w/o Encl.)
        Eric D. Schmadeke via email (w/o Encl)
        XTC US Xpress, Inc. (w/Encl.)
          Attn: Brad Barges, President

4895-0578-4944, v. 1



# DENSBORN BLACHLY LLP

**WILLIAM D. HAUT**
Direct Dial: (317) 669-0130
whaut@dblaw.com

August 10, 2023

***Personal and Confidential***

Austin Windsor
c/o XTC US Xpress, Inc.
101 W. Ohio Street
Suite 575
Indianapolis, IN 46204

Re:   Cease and Desist – Breach of Employment Agreement effective March 13, 2023 (the "Agreement")

Dear Mr. Windsor:

This law firm represents R2X LLC (the "Company"). The Company recently learned that you breached your ongoing obligations under the Agreement as a result of your employment with, and activities on behalf of, XTC US Express, Inc. ("XTC"), also located in Indianapolis and a competitor to the Company. Among your violations, you are actively soliciting the Company's customers in violation of your Agreement. The Company's investigation is continuing, and the Company would like to impress upon you the importance of complying with your ongoing obligations under the Agreement, a copy of which accompanies this letter.

Please consult the Agreement for the entirety of your ongoing obligations. Your obligations to the Company under the Agreement include the following provisions.

- <u>Not Use or Disclose Company Confidential Information</u>. Under Section 7 of the Agreement, you agreed, among other provisions, not to directly or indirectly disclose or use the Company's Confidential Information other than as required in the performance of you work for the Company. This means, for example, that you may not use or disclose the Company's customer list or other customer information for your own benefit of or the benefit of third parties, such as XTC. In addition to your confidentiality obligations under the Agreement, your actions violate Indiana Code § 24-2-3, commonly known as the "Indiana Trade Secrets Act."

- <u>Avoid Competing With The Company</u>. Under Section 9(b) of the Agreement, you agreed that for a period of two years following termination of your employment with the Company on June 30, 2023, that you would not contribute your knowledge related to your duties and responsibilities for the Company to an entity engaged in the same or similar business as the Company in any county in which the Company is providing freight brokerage services, delivery or warehousing solutions at the time your employment ended (as further described in the Agreement). Your employment and activities with XTC violate your commitment.

- <u>Avoid Soliciting Company Employees</u>. Under Section 9(c) of the Agreement, you agreed, among other provisions, that for a period of two years following termination of your

Austin Windsor
August 10, 2023
Page 2 of 2

employment with the Company that you would not, directly or indirectly, solicit, hire, or recruit any of the Company's employees that were employed by the Company during the 12 months preceding your departure. If you have solicited any such Company employees to work for XTC, you will be in direct violation of your commitments to the Company, exposing you to financial damages and injunctive relief.

- <u>Avoid Soliciting Company Customers</u>. Under Section 9(d) of the Agreement, you agreed, among other provisions, that for a period of two years following termination of your employment with the Company that you would not, directly or indirectly, solicit or contact the Company's current or prospective customers that you worked with on behalf of the Company. Soliciting or brokering freight services through XTC for Company customers and prospective customers, is a direct violation of your commitments to the Company, exposing you to substantial financial damages and injunctive relief.

The Company wishes you well in the next chapter of your professional career, but it will not allow you to unlawfully use its trade secrets and violate your obligations under the Agreement.

Please note that in addition to the financial damages the Company will seek to recover for the breach of your obligations under the Agreement, you agreed to pay all reasonable attorneys' fees incurred by the Company to enforce the terms of the Agreement and the Company will seek to recover all such fees.

As you authorized in the Agreement, the Company may provide a copy of the Agreement to third parties, such as XTC, making them aware of your ongoing obligations.

The Company expects you to immediately cease and desist from all wrongful conduct in violation of your ongoing obligations under the Agreement and applicable law, including termination of your employment with XTC. Failure to do so will result in further action by the Company, which will include a lawsuit seeking monetary damages and an immediate order putting an end to your wrongful conduct. We trust that such action will not be necessary.

Sincerely,

DENSBORN BLACHLY, LLP

William D. Haut

WDH/cdb
Encl.

cc:    Joel Cox via email (w/o Encl.)
       Joel Hale via email (w/o Encl.)
       Khris Hale via email (w/o Encl.)
       Eric D. Schmadeke via email (w/o Encl)

4895-0578-4944, v. 2

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is entered into as of March 13, 2023 (the "Effective Date") by and between R2X LLC, d/b/a Ready-2-Xecute, an Indiana limited liability company, with a principal place of business located at 10475 Crosspoint Blvd., Suite 250, Indianapolis, Indiana 46256 ("Company"), and Austin Windsor ("Employee"), residing at 11405 Indiana Creek Road  Indianapolis, IN  46236 . Company and Employee are collectively referred to as the "Parties").

In consideration of Employee's employment or continued employment by Company as **Account Representative**, which Employee acknowledges to be good and valuable consideration for Employee's obligations hereunder, Company and Employee hereby agree as follows:

1.      Employment. Company hereby employs or continues to employ Employee, and Employee hereby accepts employment upon the terms and conditions of this Agreement.

2.      Position and Duties. As an **Account Representative**, Employee shall have the responsibilities set forth in the job description attached as Exhibit A and such other duties for Company as may from time to time be assigned by Company to Employee. Employee shall report to Company's **Account Representative**. Employee's position is a full-time position. Employee shall devote substantially all of Employee's business time and attention to the performance of Employee's duties hereunder and will use Employee's best energies and abilities in the performance of Employee's duties and responsibilities. Employee shall comply with all policies, procedures, and practices of Company as they exist from time to time, and all applicable federal, state, and local laws, regulations, and ordinances. Employee will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere with the performance of such duties, either directly or indirectly, without the prior written consent of Company's CEO.

3.      Compensation. In consideration of Employee's services as **Account Representative**, Employee will receive the compensation set forth in Exhibit B attached hereto, payable in accordance with Company's customary payroll practices and applicable wage payment laws, but no less frequently than monthly, and subject to all withholdings and deductions as required or permitted by law. Company reserves the right, in its sole discretion, to prospectively modify Employee's compensation from time to time, to the extent permitted by applicable law.

4.      Benefits. Employee will be eligible to participate in any employee benefit plans and programs in effect from time to time, as are made available to other similarly situated employees of Company, in accordance with and subject to the eligibility and other provisions of such plans and programs. Company reserves the right, in its sole discretion, to prospectively modify or terminate any of its benefit plans or programs from time to time.

5.      Business Expenses. Employee shall be entitled to reimbursement for all reasonable, ordinary and necessary out-of-pocket business, entertainment and travel expenses incurred by Employee in

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

connection with the performance of Employee's duties hereunder in accordance with Company's expense reimbursement policies and procedures in effect from time to time.

      6.   <u>Employment Relationship</u>. Employee is employed by Company at-will, meaning that either Employee or Company may terminate the employment relationship at any time, with or without cause, and with or without notice. Any contrary representations, if any, that may have been made to Employee at any time prior or subsequent to the Effective Date are superseded by this Agreement. Although Employee's duties, title, compensation, and benefits, as well as Company's personnel policies and procedures, may change from time to time, the "at-will" nature of Employee's employment may only be changed in an express agreement signed by Employee and Company's CEO.

      7.   <u>Confidential Information</u>. Employee understands and acknowledges that during the course of employment by Company, Employee will have access to and learn about Confidential Information, as defined below.

      (a)   <u>Confidential Information Defined</u>. For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic, or any other form or medium, relating directly or indirectly to: business practices, plans, publications, documents, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, proprietary computer software, records, supplier information, vendor information, financial information, accounting information and records, legal information, marketing information, advertising information, pricing information, personnel information, employee lists, supplier lists, vendor lists, reports, sales information, revenue, costs, ideas, customer information and customer lists of Company or its businesses or affiliates, or any existing or prospective customer, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to Company in confidence.

      Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified or treated as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

      Employee understands and agrees that Confidential Information includes information developed by Employee in the course of Employee's employment by Company as if Company furnished the same Confidential Information to Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to Employee, provided that the disclosure is through no direct or indirect fault of Employee or person(s) acting on Employee's behalf.

      (b)   <u>Company Creation and Use of Confidential Information</u>. Employee understands and acknowledges that Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its logistical and freight brokerage services for commercial customers. Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

(c)      <u>Disclosure and Use Restrictions</u>. Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of Company) not having a need to know and authority to know and use the Confidential Information in connection with the business of Company and, in any event, not to anyone outside of the direct employ of Company except as required in the performance of Employee's authorized employment duties to Company or with the prior consent of Company's CEO in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of Company, except as required in the performance of Employee's authorized employment duties to Company or with the prior consent of Company's CEO in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

Employee understands and acknowledges that Employee's obligations under this Agreement regarding any particular Confidential Information begins immediately when Employee first has access to the Confidential Information (whether before or after beginning employment with Company) and shall continue during and after Employee's employment by Company until the time that the Confidential Information has become public knowledge other than as a result of Employee's breach of this Agreement or breach by those acting in concert with Employee or on Employee's behalf.

(d)      <u>Permitted Disclosures</u>. Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Employee shall immediately provide written notice of any such order to Company's CEO.


8.      <u>Security</u>.

(a)      <u>Security and Access</u>. Employee agrees and covenants (i) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding computer equipment, telephone systems, voicemail systems, facilities access, key cards, access codes, internet, computer systems, email systems, computer networks, document storage systems, software, data security, firewalls, passwords and any and all other Company facilities, information technology resources, and communication technologies ("Facilities Information Technology and Access Resources"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of Employee's employment with Company, whether termination is voluntary or involuntary. Employee agrees to notify Company promptly in the event Employee learns of any violation of the foregoing by Employee or others, or of any other misappropriation or unauthorized access, use,

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Company property or materials by others.

(b)    <u>Exit Obligations</u>. Upon (i) voluntary or involuntary termination of Employee's employment or (ii) Company's request at any time during Employee's employment, Employee shall (a) provide or return to Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, smartphones, equipment, manuals, reports, files, books, compilations, work product, email messages, recordings, disks, thumb drives, or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information, that are in the possession or control of Employee, whether they were provided to Employee by Company or any of its business associates or created by Employee in connection with Employee's employment by Company; and (b) delete or destroy all copies of any such documents and materials not returned to Company that remain in Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in Employee's possession or control, certifying such deletion or destruction in writing.

9.    <u>Restrictive Covenants</u>.

(a)    <u>Acknowledgment</u>. Employee understands that the nature of Employee's position gives Employee access to and knowledge of Confidential Information and places Employee in a position of trust and confidence with Company. Employee acknowledges that Company provides logistical and freight brokerage services to commercial customers across the continental United States, Canada and Mexico, and that Company's business and Employee's service on behalf of Company are not limited to any specific geographic territory within the continental United States, Canada and Mexico. Employee further understands and acknowledges that Company's ability to reserve Confidential Information for the exclusive knowledge and use of Company is of great competitive importance and commercial value to Company, and that improper use or disclosure by Employee is likely to result in unfair or unlawful competitive activity. If Employee is engaged in a sales position, Employee further understands and acknowledges that Employee's primary responsibilities include developing new business for Company by promoting and soliciting the sale of Company's services to prospective and existing customers, and initiating and attending sales calls and meetings with prospective and existing customers, resulting in Employee developing and maintaining critical relationships necessary for the success and growth of Company's business.

(b)    <u>Non-Competition</u>. Because of Company's legitimate business interest as described in this Agreement and the good and valuable consideration offered to Employee, the receipt and sufficiency of which is acknowledged, during the term of Employee's employment and for a period of 24 months thereafter, beginning on the last day of Employee's employment with Company, whether terminated for any reason or no reason, by Employee or Company (the "Restricted Period"), Employee agrees and covenants not to engage in Prohibited Activity (defined below) in the logistical and freight brokerage services industry, including warehousing, fulfillment, product delivery and general freight management solutions for commercial customers within the continental United States, Canada and Mexico.

For purposes of this non-compete clause, "Prohibited Activity" is activity in which Employee contributes Employee's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, advisor, consultant, contractor, agent, or any other similar

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

capacity related, in whole or in part, to Employee's duties and responsibilities while employed by Company, to an entity engaged in the same or similar business as Company, including those engaged in the business of providing logistical and freight brokerage services, for commercial customers that compete with the logistical and freight brokerage services offered by Company or any affiliate of Company within the continental United States, Canada and Mexico. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

Nothing in this Agreement shall prohibit Employee from purchasing or owning less than two percent of the publicly traded securities of any corporation, provided that such ownership represents a passive investment, and that Employee is not a controlling person of, or a member of a group that controls, such corporation.

This Section does not, in any way, restrict or impede Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. Employee shall promptly provide written notice of any such order to Company's CEO.

(c)       Non-Solicitation of Employees. Employee understands and acknowledges that Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to Company. Employee agrees and covenants not to directly or indirectly (a) solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of Company or any employee who has been employed by Company in the 12 months preceding the last day of Employee's employment (collectively, "Covered Employee"), or (b) induce the termination of employment of any Covered Employee during the Restricted Period.

This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if Employee merely updates Employee's LinkedIn profile or connects with a Covered Employee on Facebook, LinkedIn, or other social media platform without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this Section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, Employee from exercising protected rights that cannot be waived by agreement. Furthermore, this Section shall not be deemed to prohibit Employee from continuing or commencing a personal relationship or non-competitive business relationship.

(d)       Non-Solicitation of Customers. Employee understands and acknowledges that because of Employee's experience with and relationship to Company, Employee will have access to and will learn about much or all of Company's customer information, including, but not limited to, customer contact names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's sales.

Employee understands and acknowledges that: (i) Company's relationships with its customers is of great competitive value; (ii) Company has invested and continues to invest

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

substantial resources in developing and preserving its customer relationships and goodwill; (iii) Employee's responsibilities include providing services to and/or for the benefit of Company's customers for the duration of the customer's relationship with Employer, and (iv) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to Company.

Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this Agreement, or meet with Company's current or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by Company. However, it will not be deemed a violation of this Agreement if Employee merely updates Employee's LinkedIn profile, or connects with a covered customer or former customer on Facebook or LinkedIn, without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This restriction shall only apply to: (i) customers Employee serviced or solicited during the last 12 months of Employee's employment with Company, and (ii) prospective customers to whom Company has made a written or verbal proposal or solicitation for which Employee was directly involved or had supervisory responsibility during the 12 months preceding the end of Employee's employment with Company.

10. <u>Non-Disparagement</u>. The Parties agree and covenant that they will not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the other or their respective employees, officers, and existing and prospective customers, suppliers, investors, and other associated third parties. This Section does not, in any way, restrict or impede either Employee or Company from exercising protected rights to the extent that such rights cannot be waived by agreement, including to communicate with any administrative or regulatory agency to report suspected unlawful conduct or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

11. <u>Acknowledgment</u>. Employee acknowledges and agrees that: (i) Employee's services to be rendered to Company are of a special and unique character; (ii) that Employee will obtain knowledge and skill relevant to Company's industry, methods of doing business, and marketing strategies by virtue of Employee's employment; (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of Company; and (iv) that Employee will be reasonably able to earn a living without violating the terms of this Agreement; and (v) that Employee has the right to consult with counsel before signing this Agreement.

Employee further acknowledges that: (i) the amount of Employee's compensation reflects, in part, Employee's obligations and Company's rights under this Agreement; (ii) Employee has no expectation of any additional compensation, bonus, or other payment of any kind not otherwise referenced herein in connection herewith; and (iii) Employee will not be subject to undue hardship by reason of Employee's full compliance with the terms and conditions of this Agreement or Company's enforcement thereof; and (iv) this Agreement is not a contract of employment and shall not be construed as a commitment by either Party to continue an employment relationship for any certain period of time.

**Nothing in this Agreement shall be construed to in any way terminate, supersede, undermine, or otherwise modify the "at-will" status of the employment relationship between Company and Employee, pursuant to which either Company or Employee may terminate the employment relationship at any time, with or without cause, and with or without notice.**

12.   Remedies. In the event of a breach or threatened breach by Employee of any of the provisions of this Agreement, Employee hereby consents and agrees that money damages would not afford an adequate remedy and that Company shall be entitled to seek a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. Any equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available relief.

13.   Successors and Assigns.

(a)   Assignment by Company. Company may assign this Agreement to any affiliate, or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of Company. This Agreement shall inure to the benefit of Company and permitted successors and assigns.

(b)   No Assignment by Employee. This Agreement is personal to Employee and Employee may not assign this Agreement or any part hereof. Any purported assignment by Employee shall be null and void from the initial date of purported assignment.

14.   Warranty. Employee represents and warrants that Employee is not a party to any non-compete restrictive covenant or related contractual limitation that would interfere with or hinder Employee's ability to undertake the obligations and expectations of employment with Company.

15.   Choice of Law and Forum Selection. This Agreement, and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute, are governed by, and construed in accordance with, the laws of the State of Indiana, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the laws of any jurisdiction other than the State of Indiana to apply. Any action or proceeding by either Party to enforce this Agreement shall be brought only in any state or federal court located in or serving Marion County, Indiana. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

16.   Entire Agreement. Unless specifically provided herein, this Agreement and all exhibits attached hereto contain all the understandings and representations between Employee and Company pertaining to the subject matter hereof and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

17. <u>Modification and Waiver</u>. No provision of this Agreement may be amended or modified unless the amendment or modification is agreed to in writing and signed by Employee and by Company's CEO. No waiver by either Party of any breach of any condition or provision of this Agreement to be performed by the other Party shall be deemed a waiver of any other provision or condition at the same or any prior or subsequent time.

18. <u>Severability</u>. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, that holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding on the Parties with any modification to become a part of and treated as though originally set forth in this Agreement.

The Parties further agree that any such court is expressly authorized to modify any unenforceable provision of this Agreement instead of severing the unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making any other modifications it deems warranted to carry out the intent and agreement of the Parties as embodied in this Agreement to the maximum extent permitted by law.

The Parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. Should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, that invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth in this Agreement.

19. <u>Captions</u>. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

20. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

21. <u>Tolling</u>. If Employee violates any of the terms of the restrictive covenant obligations in this Agreement, the Restricted Period for all such restrictions shall automatically be extended by the period Employee was in violation of them.

22. <u>Attorneys' Fees</u>. If Employee breaches any of the terms of the restrictive covenant obligations in this Agreement, to the extent authorized by state law, Employee will be responsible for payment of all reasonable attorneys' fees and costs Company incurred in the course of enforcing the terms

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

of the Agreement, including demonstrating the existence of a breach and any other contract enforcement efforts.

23.    <u>Notice</u>. If and when Employee's employment with Company terminates, whether voluntarily or involuntarily, Employee agrees to provide to any subsequent employer a copy of this Agreement. In addition, Employee authorizes Company to provide a copy of this Agreement to third parties, including but not limited to, Employee's subsequent, anticipated, or possible future employer.

24.    <u>Survival</u>. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the Parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the Parties under this Agreement.

25.    <u>Acknowledgement of Full Understanding</u>. EMPLOYEE ACKNOWLEDGES AND AGREES THAT EMPLOYEE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. EMPLOYEE ACKNOWLEDGES AND AGREES THAT EMPLOYEE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date above.

"Company"

R2X LLC dba Ready-2-Xecute

By:

Joel Hale, Chief Executive Officer

"Employee"

DocuSigned by:

*Austin Windsor*          3/22/2023 | 11:40:44 PDT

7A89F572106046A...

Austin Windsor

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

<u>Exhibit A</u>

# Account Representative

## Job Description

As an Account Representative for R2X LLC (Ready-2-Xecute), you will be responsible for supporting and working with an established National Account Manager (NAM) to drive revenue. The Account Representative is focused on identifying and growing new and existing business by presenting READY-2-XECUTE customers with our newest transportation services.

**What you'll be doing:**

- Report to National Account Manager
- Direct (secondary) contact with each Regional Transportation Manager and key decision makers
- Customer facing
- Securing Freight
  - Answer coverage emails
  - Quote on Freight Allocation Module
  - Proactively reach out about freight opportunities
- Operations and service quality that ensure:
  - All customer emails are answered within a timely manner
  - All loads are covered
  - All covered loads have Macropoint, correct Planning Comment, and appropriate call in notes
  - All loads are fully progressed from pick up to delivery
  - All loads in delivered status have paperwork collection progression
  - Direct Carrier Operations is marking loads ready to bill in a timely manner
  - Be aware of customer KPI's and work to reach/ overachieve them
- Handle and solve complex problems
  - Handle returns/ diversions directly with customer
  - Handle pick-up/delivery issues
  - Handle difficult carriers
  - Handle claims with customer
  - Handle billing issues directly with Ready-2-Xecute billing team
- Stay up to date with market conditions
  - Set appropriate price targets
  - Know when to lower or raise price targets based on capacity
  - Make final decision on appropriate price to book loads
  - Handle RFP's
  - Report to National Account Manager if any drastic rate changes are needed
- Delegate task to DCO as needed
- Take responsibility of FRT (assigned Freight Revenue Code) performance
- Responsible for after hour escalations, can delegate to DCO (Dedicated Carrier Operations)

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

<u>Exhibit B</u>

**2023 Incentive Compensation Plan**
**Account Representative**

**Section I.     Purpose**

R2X LLC ("Company") 2023 Incentive Compensation Plan for Account Representative ("Plan"), including Section II. ("Incentive Structure") sets forth each covered Participant's agreement with Company regarding incentive compensation and the other matters set forth in the Plan. It is the responsibility of the Employee ("Participant") to carefully read this Plan.

**Section II.     Incentive Structure**

The following job title is covered under this Plan:

- Account Representative

**Plan Design**
Incentive compensation shall be comprised of Participant's Incentive Payment determined in accordance with this Section.

**Incentive Compensation Components**

Account Representative compensation is composed of a Base Salary plus incentive compensation (Commission). There is no maximum compensation amount under the terms of this Plan.

| Plan Component | Commission Rate | Maximum Annual Incentive | Payout Frequency |
|---|---|---|---|
| Commission - Collected Paid Freight Margin of assigned FRT code | Percentage of the collected freight margin earned on Collected Paid Freight of assigned FRT code. Commission amount is based on a tiered structure illustrated below | Unlimited | Monthly |

| Account Representative Commission Tiers | | |
|---|---|---|
| Collected Paid Freight Margin | | Commission % Earned |
| $            -          TO       $          25,000.00 | | 3% |
| $     25,000.01     TO          UNLIMITED | | 11% |

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

**Commission – Collected Paid Posted Freight Margin**

**Definition:**  Commission is defined as pay based on a percentage of the collected paid and posted freight margin of assigned Freight Revenue Code (FRT)

**Performance Period:**  Each calendar month is a Performance Period under the Plan

**Collected Paid Freight Margin:** The amount received and posted, from a customer, as a payment in full for the amount input into Company TMS and billed to customer.

**Account Representative - Compensation**

Participant will be compensated on a salary plus commission basis. Participant's commissions will be based on a percentage of "Collected Paid Posted Freight Margin" each month, and the commission rate will be based on a fixed rate percentage of Collected Paid Posted Freight Margin on assigned FRT. The "Collected Paid Posted Freight Margin" is determined by Participant's PAID freight bills for the preceding month(s), including any layover and detention pay, less the freight cost paid to the trucking companies and any additional expenses. Collected Paid Posted Freight Margin is determined monthly, and commissions are paid on the last payday of the month following the month for which the Collected Paid Freight Margin has been determined and posted to Customer's Account.

For example, if Participant's Collected Paid Posted Freight Margin for October is $70,000.00, Participant's commission will be $7,700.00 paid to Participant (70,000.00*.11=$7,700.00). If Participant's Collected Paid Posted Freight Margin for November is $130,000.00, Participant's commission will be $14,300.00 paid to Employee (130,000.00*.11=$14,300.00).

All salary and commission payments are subject to withholdings and deductions as required or permitted by law.

**Exceptions to Compensation**

A. It is expected that the compensation plan will be adhered to as written. Any exceptions to the Plan will be reviewed in accordance with the guidance of Company's Executive Team.
B. Management Discretion will be used to protect Company from unjustifiable compensation expenses.
C. If the Participant should be assigned to a new position, then the Participant shall be entitled and paid for commissions earned in accordance with the terms of this Incentive Compensation Plan.
D. Negative commissions will be carried forward and collected from commissions earned in the following months until all negative commissions are collected by Company prior to any positive commission paid out.
E. The determination shall be at the sole discretion of the Company's CEO.
F. Any manipulation on behalf of Participant(s), in an attempt to obtain and/or increase a higher commission earnings, will result in disciplinary action up to and including termination. In any such case Participant(s) will forfeit all commission payouts.
G. No commissions will be paid on any of the following loads:
   a. Paperwork has not been received by operations within 25 days of delivery date - BOL/TEAM and Receipts
   b. Loads that have not received payment in full that is equal to the amount input in TMS and billed.
   c. Loads which contain false or incomplete information.

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

H.  Losses / Claims on loads will be audited for accurate and detailed required load information specific to the customer's requirements. If it is deemed that the specific required information was not entered into the Company's TMS system and the requirements were not provided to the carrier, then the loss or claim shall be the responsibility of the FRT for which the customer is assigned.

**Plan Provisions/Operational Terms and Definitions**

<u>**Active Employment.**</u>   Performing, in good faith, all the material duties and responsibilities of your job with Company in a position covered by Section II. of this Plan. Participant must be actively employed on the last day of the performance period to be eligible for incentive compensation payment.

<u>**Closed Business.**</u> Business entered in the applicable line of business system and eligible for calculation of Incentive Compensation pursuant to Section II. during Participant's Active Employment.

I.  <u>**Definition of Closed Business specific to this Plan**</u>
   a.  Receipt of Freight Tender from customer
   b.  Load created in system with Load # and Tender attached.
   c.  Receipt of Freight Bill and Proof of Delivery with Receiving Party Signatures
   d.  Completed Freight Bill Submitted to Billing Department along with any additional accessorial receipts.
   e.  Payment received and posted by Accounts Receivable Department into system.

<u>**Effective Date.**</u>  This Plan is effective April 1, 2023, through January 31, 2024, or such subsequent date that a new Incentive Compensation Plan becomes effective or until modified or terminated by Company pursuant to the term of the Plan.

<u>**Incentive Payment or Incentives.**</u> Amounts eligible for payment during Active Employment under this Plan by Participant pursuant to the calculations set forth in Section II.

<u>**Incentive Payment Date.**</u> Incentive Payment(s) shall be made in accordance with Company's regular payroll processes and Incentive Payment will be processed on the last pay date of each month for the prior month's collected posted paid freight.

<u>**Termination of Employment.**</u> The separation of Participant from employment with Company regardless of whether the reason for termination was voluntary, involuntary, reduction of force, or any other reason for ending employment.

**Section III.      Eligibility for Incentive Payments**

A.  **Plan Acknowledgment**

Participant's signature and initials on this Agreement shall be construed as Acknowledgment of Incentive Plan and qualifications to receive Incentive Payments under this Plan. Participant acknowledges and agrees, with the exception of a written modification signed by the Company's CEO, no statements or communications, whether oral or written, will modify Agreement or Incentive Plan.

B.  **Active Employment**

DocuSign Envelope ID: 4A7ACB73-B6EB-4658-AEF7-D6A674EDC606

Participants must meet the definition of Active Employment the last day of the Performance Period in a position covered under the Plan to receive Incentive Payment. No credit will be given for any Closed Business after the last day of Active Employment.

### C.  Participant Responsibility

Incentive Payment(s) will be based on data contained in the official line of business sales system or other applicable tracking systems; therefore, if Participant enters data into a system, it is the responsibility of each Participant to correctly input all related information into the system. Participants are responsible for auditing all applicable systems for errors and must immediately notify Company of any errors. Participant will be deemed to have agreed to the accuracy of the Incentive Payment and no adjustments will be made based on errors asserted by Participant.

### D.  Plan Modification

This Plan may be modified, in whole or in part, or terminated prior to the end of the Plan's term by Company upon giving ten (10) days' notice to Participant. Incentives earned will be calculated pursuant to this Plan for all Closed Business (as defined in Section II.) prior to the modification or termination of the Plan. No modification or waiver of any provision of this Plan shall be valid unless in writing and signed by Company's CEO and any waiver shall only be valid as to the specific circumstances for which it was given.

DocuSigned by:

*Austin Windsor*          3/22/2023 | 11:40:44 PDT

7A69F572108948A...

Employee Signature                    Date

Austin Windsor

Printed

Joel Hale, CEO